IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EDELMAN FINANCIAL ENGINES LLC,    )
and EDELMAN FINANCIAL ENGINES,    )
L.P.,                             )
                                  )
              Plaintiffs,         )
                                  )
         v.                       )    C.A. No. 25-1412 (MN)
                                  )
PRIME CAPITAL INVESTMENT          )
ADVISORS, LLC,                    )
                                  )
              Defendant.          )

**<u>MEMORANDUM OPINION</u>**

Timothy Ryan Dudderar, Tyler E. Cragg, POTTER ANDERSON & CORROON, LLP, Wilmington, DE; Akiva Shapiro, Grace E. Hart, Harris Mufson, GIBSON, DUNN & CRUTCHER LLP, New York, NY – Attorneys for Plaintiffs Edelman Financial Engines LLC and Edelman Financial Engines, L.P.

Brian Egan, Cameron P. Clark, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Douglas M. Weems, Michael W. Seitz, SPENCER FANE LLP, Kansas City, MO – Attorneys for Defendant Prime Capital Investment Advisors, LLC.

March 12, 2025
Wilmington, Delaware

*Maryellen Noreika*

**NOREIKA, U.S. DISTRICT JUDGE**

Prime Capital Investment Advisors hired employees (financial planners) from a competitor, Edelman Financial Engines. Those employees, however, had entered into restrictive covenants with Edelman Financial Engines during their employment there. At this early stage, relief is warranted as to the two of those employee who are the subject of Edelman's motion for injunctive relief (D.I. 32) to ensure those employees abide by the confidentiality and non-solicitation provisions in their restrictive covenants, at least until this Court can hold a preliminary injunction hearing.

I.    **BACKGROUND**

A.    **The Parties**

Plaintiffs Edelman Financial Engines LLC and Edelman Financial Engines, L.P. (collectively, "Edelman") compete with defendant Prime Capital Investment Advisors ("Prime") in the financial planning space. Edelman Financial Engines LLC is a Delaware LLC with its principal place of business in Massachusetts. (D.I. 45 ¶ 13). It is wholly owned by Edelman Financial Engines, L.P., which is a Delaware L.P. (*Id.*). Prime is a Kansas LLC with its principal place of business in Kansas. (D.I. 15 at 2).

B.    **History of this Litigation**

Edelman filed this case on November 19, 2025. (D.I. 1). The original complaint painted a picture of a nefarious scheme hatched and executed by Prime's senior executives to poach Edelman's financial planners and induce those planners to misappropriate trade secrets and breach their contractual obligations to Edelman. (*See generally*, *id.* ¶¶ 6–12, 57–81). Specifically, the complaint alleged that Prime lured Edelman's planners with "lucrative compensation packages" before providing those planners with a "playbook" to steal Edelman's confidential client information. (*Id.* ¶¶ 6–8). According to Edelman, that playbook involves copying client lists and

contact information through "undetectable means" during the planners' final days at Edelman.  (*Id.* ¶ 7).  Then, once the planners leave Edelman and joined Prime, the planners contact their now-former clients using the misappropriated client lists and contact information and recruit those former clients to be new Prime clients.  (*Id.* ¶ 8).  The problem with this scheme, says Edelman, is that each of the departed financial planners signed various agreements with Edelman expressly prohibiting the planners from soliciting any of their old clients.  (*Id.* ¶ 4).  So Edelman sued Prime for tortious interference with contract (Count II) and tortious interference with business relations and/or contracts (Count III).[1]  (*Id.* ¶¶ 95–115).

Initially, Edelman did not move for preliminary or emergency relief.  But when, on February 13, 2026, Prime allegedly deployed its playbook yet again, Edelman apparently decided it had had enough and moved for a temporary restraining order ("TRO") and preliminary injunction.  (D.I. 34).  At the Court's request, Prime responded on an expedited basis.  (D.I. 42).  The Court heard argument via teleconference on February 23, 2026 and requested that the parties submit additional briefing and that Edelman file an amended complaint.  (D.I. 43).  The parties submitted the additional briefing and Edelman submitted its amended complaint that same week.  (D.I. 44, 45, 51, 52, 53).

### C.    Allegations Related to Greenspon and Salyer

According to Edelman, on February 13, 2026 (months after the original complaint was filed), Prime poached two more of Edelman's financial planners: Joan Greenspon and Amanda Salyer.  (D.I. 45 ¶ 11).  In doing so, Edelman alleges that Prime tortiously interfered with contracts that Greenspon and Salyer had with Edelman.

---

[1]    Edelman also brought claims for trade secret misappropriation under 18 U.S.C. § 1836, aiding and abetting breach of fiduciary duty (Count IV), unfair competition (Count V), and conspiracy (Count VI), but those claims are not the basis for Edelman's TRO request.

### 1.    <u>Relevant Provisions in Greenspon and Salyer's Contracts</u>

Greenspon entered into two agreements with Edelman relevant to Edelman's tortious interference claims: a Restrictive Covenant Agreement (D.I. 35, Ex. B ("Greenspon RC Agreement")), and a Proprietary Information, Non-Solicitation, Non-Disparagement and Arbitration Agreement (D.I. 35, Ex. C ("the Greenspon PINNA Agreement")).   In both agreements, Greenspon agreed to keep client lists and client information confidential (Greenspon RC Agreement § 1(a)(i); Greenspon PINNA Agreement § 1(a)),[2] and that, if her employment with Edelman was terminated, she would not solicit or accept business from any of Edelman's clients for fifteen months.   (Greenspon RC Agreement §§ 4(b), (e); Greenspon PINNA Agreement §§ 4(b), (e)).[3]

Salyer entered into a Confidential Information and Invention Assignment Agreement and an Addendum thereto (D.I. 35, Ex. D ("the Salyer CIIA Agreement"); *id.* Ex. E ("the Salyer CIIA Addendum")) that contain similar restrictions, except Salyer's non-solicit provision is limited to

---

[2]    "Participant agrees that at all times following the date of this Agreement, Participant shall: (i) hold in confidence and refrain from disclosing to any other party all information of a proprietary or confidential nature . . . such as information relating to customers, Clients, Potential Clients, any customer, Client or Potential Client lists, Client or Potential Client financial and personal information . . . ."  (Greenspon RCA Agreement § 1(a)(i); *see also* PINNA Agreement § 1(a) (similar)).

[3]    "Non-Solicitation/Non-Hire. ***Participant hereby agrees that Participant will not*** (other than on behalf of the Partnership in the course of Participant's services to the Partnership or with the Partnership Group's express authorization), directly or indirectly, individually or through an agent, employee, or on behalf of another, as an employee, director, owner, partner, member, sole proprietor, consultant, agent, representative, shareholder, or in any other manner or capacity whatsoever, ***during the Restricted Period***: (1) ***Initiate contact with, or otherwise solicit, persuade, or induce, or attempt to solicit, persuade, or induce, any Client with whom Participant has worked***, communicated or dealt on behalf of the Partnership Group, or any other Client that received services from any office, branch or principal work location at which Participant was based, ***to terminate, reduce or not renew its relationship with the Partnership Group[.]***"  (Greenspon RC Agreement § 4(b)(1); *see also* PINNA Agreement § 4(b) (similar) (emphasis added)).

twelve months, and her non-acceptance provision is eighteen months.    (Salyer CIIA Agreement § 2(a)–(b),[4] 6(b);[5] *id.*, Salyer CIIA Addendum § 3).[6]  Salyer's agreement also had a provision requiring her to provide four-weeks' notice either in person or live via telephone to her manager before resigning.  (Salyer CIIA Addendum § 2).[7]

### 2.    Allegations Related to Greenspon and Salyer

Greenspon and Salyer, two Philadelphia-based financial planners, resigned from Edelman on February 13, 2026, the Friday before a holiday weekend.  (D.I. 45 ¶¶ 1, 11, 21, 82).  They joined Prime.  (*Id.* ¶ 84).  Rather than calling or emailing anyone at Edelman to resign, Greenspon and Salyer mailed their resignations to Edelman's Santa Clara, California office.  (*Id.* ¶ 83).  Edelman

---

[4]    "(a) [] I will not engage in any use or disclosure of Confidential Information. . . . [] (b) [] ***Company's Confidential Information shall be presumed to include*** proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, suppliers, ***customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment)***, prices and costs, . . . ."  (Salyer CIIA Agreement § 2(a)–(b) (emphasis added)).

[5]    **Non-interference with Customers**. Further, ***for a period of twelve (12) months*** following termination of my Relationship with the Company by either party for any reason (with or without cause), ***I shall not solicit any*** licensor to, or established ***customer of the Company, or licensee of the Company's products (collectively "Covered Customers"), that I have Material Contact with as a result of my Relationship with the Company*** . . . ."  (Salyer CIIA Addendum § 6(b) (emphasis added)).

[6]    "***I agree that for 18 months after my employment with Financial Engines ends, I will not directly or indirectly accept Business from, or do Business with, any Workplace Channel Client***. . . . ***Employee shall not, during the Restricted Period***, directly or indirectly, on Employee's behalf or for or on behalf of any other person, firm, corporation or entity: (a) ***solicit, divert, or take away***, or attempt to solicit, divert or take away, ***from Financial Engines the business of any of the Clients*** . . . ."  (Salyer CIIA Addendum § 4(a)–(b) (emphasis added)).

[7]    "**Notice of Resignation.** [] (a) I will provide four weeks' notice of my resignation in writing and such notice shall not be effective unless and until it is delivered in person or via telephone live (i.e., not via voice message) to my manager[.]"  (Salyer CIIA Addendum at § 2).

did not receive those resignations until the next week. (*Id.* ¶ 83). In the months leading up to her resignation, Salyer allegedly emailed herself her entire Edelman client list eighteen times. (*Id.* ¶ 89; D.I. 42-1 ¶¶ 6–11).[8] Many of those clients live in Delaware. (D.I. 49, Ex. 2 (listing Salyer's DE-based clients), Ex. 4 (listing Greenspon's DE-based clients)).

The same day Salyer mailed her resignation letter, she started at Prime and began contacting the clients she worked with at Edelman, including those in Delaware. On February 13, 2026, Salyer sent an email saying:

> Hello,
>
> I am writing to inform you of a recent change in my professional affiliation. As an investment adviser representative, I am committed to upholding my fiduciary duty and ensuring transparency with my clients. This includes disclosing material information that a reasonable client might consider important when deciding whether to engage or continue engaging in investment advisory services from myself or my prior firm.
>
> I would like to announce that I have recently resigned from Edelman Financial Engines and I have joined Prime Capital Financial.
>
> With sincere and kind regards,
>
> Amanda Salyer

(D.I. 35, Ex. N (Salyer Email)). The email concluded by providing Salyer's contact information at Prime. (*Id.*). Greenspon sent a nearly identical email the Monday following her resignation from Edelman. (D.I. 35, Ex. O (Greenspon Email)).

Edelman submitted a declaration from Brian Lipps, Greenspon and Salyer's former supervisor, stating that, since Greenspon left Edelman, 160 of Greenspon's Edelman clients,

---

[8]    Salyer does not deny that she was emailed her entire client list eighteen times, but disputes Edelman's characterization, claiming it was a weekly email configured in Salesforce. (D.I. 42-1 ¶ 11).

totaling $236.2 million assets under management, have cancelled their accounts with Edelman. (D.I. 58 ⁋ 5). Greenspon's Edelman clients began leaving Edelman on February 18, 2026, just five days after Greenspon resigned from Edelman. (*Id.*). Similarly, since Sayler left Edelman, 93 of Salyer's Edelman clients totaling $69.7 million in assets under management, have cancelled their accounts with Edelman. (*Id.* ⁋ 6). Salyer's Edelman clients began leaving Edelman on February 17, 2026, just four days after Salyer resigned from Edelman. (*Id.*).

## II.    LEGAL STANDARD

Preliminary injunctive relief, such as a TRO, is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Because a preliminary court order may "allow or disallow anticipated action before the legality of that action has been conclusively determined[,]" a moving party seeking that order must show: (1) a likelihood of success on the merits; (2) irreparable harm absent preliminary relief; (3) that the balance of the equities are in its favor; and (4) that the public interest is supported by the relief. *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024). The first two factors are the most important; a failure to show either a likelihood of success or risk of irreparable harm will "necessarily result in the denial of a preliminary injunction." *Delaware State Sportsmen's Ass'n, Inc.*, 108 F. 4th at 202 (quoting *Nken*, 556 U.S. at 434); *S. Camden Citizens in Action v. N.J. Dep't of Env't Prot.*, 274 F.3d 771, 777 (3d Cir. 2001) (citation omitted).

## III.    DISCUSSION

### A.    Prime's Procedural Arguments

Prime raises several procedural arguments to avoid a decision on the merits of Edelman's TRO request. *First*, Prime says this Court does not have personal jurisdiction over Prime. But the complaint adequately suggests that Prime expressly aimed its tortious activities at Delaware and

has the minimum contacts required for personal jurisdiction. *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001); *see also Calder v. Jones*, 465 U.S. 783 (1984). Those facts include that Prime has engaged in a scheme to poach Edelman's financial planners and induce those planners to "solicit[] and steal[] Edelman's clients – several of whom reside in Delaware." (D.I. 45 ¶¶ 20–21). And it appears Prime coordinated Greenspon and Salyer's effort to solicit their former Edelman clients, including those in Delaware, because the outreach emails that Greenspon and Salyer sent to their former clients were nearly identical. (D.I. 35, Ex. N (Salyer Email) and Ex. O (Greenspon Email)). Put differently, Prime assisted Greenspon and Salyer's solicitation efforts knowing those efforts would require reaching into Delaware to solicit Delaware residents. Those solicitation efforts appear to have been successful, with "at least two" of Edelman's former Delaware clients having been engaged by Prime in the wake of Greenspon and Salyer's departure from Edelman. (D.I. 45 ¶ 92; *see also* D.I. 44 at 2 (Prime admitting that "three [] customers [] followed Greenspon and Salyer to PCIA"). Thus, not only do the claims in this lawsuit arise out of Prime's contacts with Delaware, Edelman, a Delaware corporation, is feeling the brunt of the harm in Delaware. *See Calder*, 465 U.S. at 790; *see also Bell Helicopter Textron, Inc. v. C & C Helicopter Sales, Inc.*, 295 F. Supp. 2d 400, 410 (D. Del. 2002) ("Thus, the heart of the holding in *Calder* was that any tortious conduct intentionally directed at a party confers personal jurisdiction over the tortfeasor in the district where the victim resides.").

In any event, at a minimum, Edelman has pleaded "'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state.'" *Toys "R" Us, Inc. v. Step Two,* 318 F.3d 446, 456 (3d Cir. 2003) (quoting *Mellon Bank (E. PSFS, Nat'l. Ass'n. v. Farino,* 960 F.2d 1217, 1223 (3d Cir. 1992)). Thus, it would be improper to dismiss this case for lack of jurisdiction absent jurisdictional discovery, which the Court has granted. *See Toys*

*"R"Us,* 318 F.3d at 456 ("If a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between [the party] and the forum state, the plaintiff's right to conduct jurisdictional discovery should be sustained." (citations and quotations omitted)); (D.I. 43 at 63:1–2). If, once jurisdictional discovery is complete, Prime still thinks personal jurisdiction is improper, it may re-raise its argument at that time.

**Second**, Prime says claims regarding Greenspon and Salyer are not properly before this Court because allegations as to Greenspon and Salyer were not included in the original complaint. (D.I. 42 at 2–3; D.I. 44 at 1). But the original complaint alleged that Prime engaged in a scheme to poach Edelman's financial planners and induce those planners to breach their contractual obligations to Edelman by exploiting Edelman's confidential information and soliciting their former Edelman clients. (D.I. 1 ¶¶ 95–115). That is exactly what Edelman alleges happened with Greenspon and Salyer. (D.I. 34 at 9–10; *see* D.I. 45 ¶¶ 20–21, 82–95). Moreover, the Court asked Edelman to provide an amended or supplemental complaint detailing the allegations related to Greenspon and Salyer, which Edelman did. (D.I. 43 at 61:23–14, 63:1–17; D.I. 45 (Amended Complaint)). And Prime conceded that Edelman could moot "this specific issue via amending its complaint." (D.I. 44 at 1). Thus, claims related to Greenspon and Salyer are properly before this Court.

**Third,** Prime says that by filing an amended complaint Edelman's TRO request is moot. (D.I. 53 at 1–2). But that is only true when an amended complaint "significantly alters the substance of the plaintiff's allegations" such as by adding "70 new paragraphs" that "introduce seven new specifically asserted claims [and] make new assertions about how Defendant infringes the asserted claims." *Reputation.com, Inc. v. Birdeye, Inc.*, No. 21-129 (CJB), D.I. 47 (D. Del. May 12, 2021) (Oral Order). This situation is materially different because the Court asked

Edelman to supplement its complaint to include additional factual allegations related to Greenspon and Salyer, which are simply another example of the scheme Edelman alleged Prime engaged in in the first complaint. (*See generally*, D.I. 45). The amended complaint does just that. (*See Id.* ¶¶ 82–95).

**Fourth**, Prime says issuing a TRO here will pre-empt state proceedings because Greenspon and Salyer are challenging their restrictive covenants in Pennsylvania state court. (D.I. 42 at 3). Perhaps recognizing the futility of this argument, did not re-raise it in supplemental briefing. (*See generally*, D.I. 44, 53). In any event, Edelman filed this case first and promptly moved for a TRO on February 19, just six days after Prime allegedly used the same playbook described in the original complaint to poach Greenspon and Salyer. (D.I. 34 at 2; D.I. 45 ¶¶ 20–21, 82–95). Thus, this is not one of the "extremely limited circumstances" in which a federal court should disregard its "virtually unflagging obligation . . . to exercise the jurisdiction given" by Congress and defer to pending state court proceedings. *Ryan v. Johnson,* 115 F.3d 193, 195–96 (3d Cir. 1997) (directing courts to consider "the order in which jurisdiction was obtained by the concurrent forums" before deferring to state-court proceedings).

### B.    Temporary Restraining Order

Now, to the merits of Edelman's TRO request. As mentioned previously, the Court must evaluate four factors: likelihood of success on the merits, irreparable harm, balancing of the equities, and the public interest. *Nken*, 556 U.S. at 434 (2009); *Delaware State Sportsmen's Ass'n, Inc.*, 108 F. 4th at 202.

#### 1.    Likelihood of Success on the Merits

To demonstrate likelihood of success on the merits, Plaintiffs need only show that their argument has a "reasonable probability of success—odds that are significantly better than negligible but not necessarily more likely than not." *Veterans Guardian Va. Claim Consulting*

*LLC v. Platkin,* 133 F.4th 213, 218 (3d Cir. 2025) (citing *Reilly v. City of Harrisburg,* 959 F.3d 173, 176, 179 (3d Cir. 2017)) (internal quotations omitted).  So for the tortious interference with contract claim,[9] Edelman must show it has a reasonable probability of success showing "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013); *Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1266 (Del. 2004).  Here, Prime only contests the first, third, and fourth prongs. (D.I. 42 at 9–13).

### a.    Whether There Was a Valid, Enforceable Contract

Edelman has shown that it is reasonably probable that Greenspon and Salyer had valid contracts with Edelman.  Indeed, Edelman provided copies of those contracts, which were signed by Greenspon and Salyer.  (*See* Greenspon RC Agreement; Greenspon PINNA Agreement; Salyer CIIA Agreement; Salyer CIIA Addendum).  These contracts prohibited Greenspon from soliciting or accepting any of Edelman's clients for fifteen months after leaving Edelman.  (Greenspon RC Agreement §§ 4(b), (e); Greenspon PINNA Agreement §§ 4(b), (e)).  And, after leaving Edelman, Salyer was prohibited from accepting any Edelman clients for eighteen months and soliciting any Edelman clients for twelve months.  (Salyer CIIA Agreement § 2(a)–(b), 6(b); Salyer CIIA Addendum § 3)).

---

[9]     Edelman also moved for a TRO under its Tortious Interference with Business Relations and Unfair Competition claim.  (D.I. 34 at 15).  Assuming, however, that Edelman prevails on that claim, the relief the Court would grant is no different than the relief the Court is granting for Edelman's TRO request based on the Tortious Interference with Contract claim.  Thus, given the urgency of this motion, the Court will address Edelman's Tortious Interference with Business Relations and Unfair Competition claim at the preliminary injunction stage.

Prime does not meaningfully contest that Greenspon and Salyer's contracts with Edelman are valid from an offer, acceptance, and consideration standpoint. As to the non-solicitation and confidentiality provisions in Greenspon and Salyer's restrictive covenants, both Delaware and Pennsylvania courts uphold sub-two-year non-solicitation and confidentiality agreements. *See, e.g., Sensus USA, Inc. v. Franklin,* No. 15-742 (RGA), 2016 WL 1466488, at *7 (D. Del. Apr. 14, 2016) (upholding two-year non-solicitation and confidentiality agreement because "Delaware courts have consistently found that two-year restrictions on covenants not to compete are reasonable"); *Synthes USA Sales, LLC v. Harrison*, No. 11-12021 (MLT), 2014 WL 11210394, at *12 (Pa. Com. Pl. May 19, 2014) (upholding non-solicitation and confidentiality agreement because "Pennsylvania courts have upheld restrictive covenants for terms of up to three years or more after employment ends."). So Edelman has shown a reasonable probability of showing that the non-solicitation and confidentiality provisions are enforceable.

The non-acceptance provisions, however, are a different matter. Under Pennsylvania law, courts must "examine and balance the employer's legitimate business interest, the 'individual's right to work, the public's right to unrestrained competition, and the right to contract . . . in determining whether to enforce a restrictive covenant.'" *Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242, 250 (Pa. Super. 2013). And although employers have a legitimate interest in their trade secrets and customer goodwill, restrictive covenants that would effectively bar employees from working anywhere but at their current employer are disfavored. *See Wolfington v. Bartkowski,* 301 A.3d 877 (Pa. Super Ct. 2023) ("Pennsylvania law disfavors restrictive covenants as restraints on trade that undercut an individual's abilities to earn a living."). The non-acceptance provisions in Greenspon and Salyer's agreements would do just that. As written, they prevent Greenspon and Salyer from accepting former clients, including those who wished to work with

Greenspon and Salyer regardless of employer, effectively forcing Greenspon and Salyer to start their careers from square one.

But even more concerning is that enforcing the non-acceptance provisions could deprive consumers of their preferred financial planner. That goes beyond what is necessary to protect Edelman's legitimate business interests and is why courts applying Pennsylvania law have refused to enforce restrictive covenants that prohibit "accepting the unsolicited business of former clients." *Diodato v. Wells Fargo Ins. USA*, 44 F. Supp. 3d 541, 570 (M.D. Pa. 2014). Similarly, under Delaware law, restrictive covenants are enforceable to the extent they "advance the legitimate economic interests of the party enforcing the covenant" and "survive a balance of the equities." *Sensus USA*, 2016 WL 1466488, at *7. Here, the non-acceptance provisions in Greenspon and Salyer's contracts go beyond what is necessary to protect Edelman's interests and would not survive a balance of the equities because these provisions prohibit consumers from accessing and working with a financial planner of their choice. *Id.* Thus, Edelman has not shown a reasonable likelihood of success as to the non-acceptance provisions. Because Edelman has not shown a reasonable likelihood of success as to the non-acceptance provisions, the Court will deny Edelman's request related to that provision. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990) ("Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue.").

### b.    <u>Whether There Was an Intentional Act Causing Breach</u>

In cases like this, this factor asks whether the defendant "intentionally acted in a way that significantly contributed to" an employee breaching their restrictive covenant with a former employer. *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC,* No. 3718 (VCP), 2010 WL 338219, at *13 (Del. Ch. Jan. 29, 2010). Implicit in this factor is that the former employee breaches their restrictive covenant, and that is where the fight under this factor lies.

According to Prime, Greenspon and Salyer did not breach their non-solicitation agreements by contacting their former clients because they "owe fiduciary duties to their clients, including informing them upon changing employment, and merely telling customers about a change in employment is not solicitation." (D.I. 42 at 11). But Prime cited no authority stating that Greenspon and Salyer were under fiduciary duties to inform their clients about a change of employment. (*Id.*). And even if those duties exist, there is no reason given why they were only discharged *after* the move had been made and using only the Prime contact information. At any rate, the emails that Greenspon and Salyer sent their former clients went beyond merely telling customers about a change in employment because they effectively invited customers to discuss "whether to engage or continue engaging in investment advisory services from myself *or my prior firm*." (D.I. 35, Exs. N, O). And Greenspon and Salyer reached out to their former clients despite agreeing to not "[i]nitiate contact with, or otherwise solicit . . . any Client with whom participant has worked[.]" (Greenspon RC Agreement § 4(b)(1); *id.*, Greenspon PINNA Agreement § 4(b) (similar); *id.* Salyer CIIA Agreement § 6(b) (similar)). So there is a reasonable probability that Greenspon and Salyer breached their non-solicitation agreements. It also appears that Greenspon and Salyer have initiated contact with hundreds of their former clients, and the only way they could have done that was by misusing confidential information they had access to while at Edelman, including client lists and contact information. Moreover, Prime does not dispute that all of this was done at Prime's behest. Thus, Edelman has shown that this factor is satisfied.

### c. <u>Whether Prime Was Justified</u>

Prime says that Edelman has failed to prove the "without justification" prong because (1) Greenspon and Salyer were required, as fiduciaries, to notify their former clients of a change in employer and (2) Prime is shielded by the competitor business privilege. (D.I. 42 at 11–12). As to the first argument, even if Greenspon and Salyer were required to notify their former

customers of an employment change, their emails to former clients go beyond merely announcing an employment change by effectively inviting customers to discuss "whether to engage or continue engaging in investment advisory services from myself *or my prior firm*." (D.I. 35, Exs. N, O). Nothing justifies inducing Greenspon and Salyer to solicit former clients in direct violation of their agreements with Edelman. As to the competitive business privilege, the single case Prime cites limits the competitive business privilege to cases where there is no "evidence that the appellant engaged in independently actionable conduct[.]" *Acumed LLC v. Advanced Surgical Servs.,* 561 F.3d 199, 220 (3d Cir. 2009). Here however, Prime engaged in independently actionable conduct by coordinating Greenspon and Salyer's departures such that they would breach their restrictive covenants with Edelman. Thus, neither of Prime's arguments are availing. Instead, Prime knew about Greenspon and Salyer's restrictive covenants but nonetheless induced them to breach those covenants. Thus, Edelman has shown that this factor is satisfied.

### 2.    <u>Irreparable Harm</u>

Edelman will suffer irreparable harm absent preliminary injunctive relief. Prime has induced two financial planners formerly employed by Edelman to breach their confidentiality and non-solicitation obligations to Edelman. The entire point of the confidentiality provisions is to protect Edelman's business interests *before* misuse occurs precisely because it is difficult, if not impossible, to calculate the harm from such misuse. *See, e.g., Horizon Pers. Commc'ns, Inc. v. Sprint Corp.,* 2006 WL 2337592, at *20 (Del. Ch. Aug. 4, 2006) ("Damages would not adequately compensate [p]laintiffs for a breach of the confidentiality provisions because the purpose of such provisions is to prevent harm and misuse before it occurs."). Absent a TRO, there is no evidence that Greenspon and Salyer will cease using Edelman's confidential information to solicit former clients, which adds another layer of irreparable, difficult-to-quantify harm: harm to Edelman's customer relationships and goodwill. *See Healthcare Servs. v. Fay,* 597 F. App'x 102, 104

(3d Cir. 2015).  And that is made worse because it is entirely possible that some of the clients Greenspon and Salyer have solicited away from Edelman would have otherwise referred friends or family to Edelman, which effectively restricts Edelman's ability to expand its business and constitutes harm that is exceedingly difficult, if not impossible to quantify.  Thus, Edelman has satisfied the irreparable harm prong.

### 3.     Balancing the Equities and Public Interest

Here, the balance of the equities favors enforcement.  Nothing prevents Greenspon and Salyer from working at Prime in a manner consistent with the contractual obligations to which they agreed.  On the other hand, Edelman faces the loss of almost half a billion dollars in assets under management if Greenspon and Salyer are permitted to misuse Edelman's confidential information and solicit their former clients away from Edelman.  Prime on the other hand cannot seriously claim it will be harmed by enforcing the confidentiality and non-solicitation agreements that Greenspon and Salyer entered into with Edelman.  After all, nothing prevents Prime from employing Greenspon and Salyer; they just cannot induce Greenspon and Salyer to breach valid, enforceable agreements with their former employer.  Similarly, issuing temporary relief is in the public's interest because "[p]arties who freely enter into binding agreements should expect to comply with the terms of those agreements." *Sensus USA*, 2016 WL 1466488, at *8.  That holds true even when the agreements at issue are restrictive covenants.

## IV.   CONCLUSION

For the foregoing reasons, Edelman's request for a temporary restraining order is GRANTED-IN-PART and DENIED-IN-PART.  An appropriate order will follow.