IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDELMAN FINANCIAL ENGINES LLC, and EDELMAN FINANCIAL ENGINES, L.P., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 25-1412 (MN) |
| PRIME CAPITAL INVESTMENT ADVISORS, LLC, | ) ) ) ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

Timothy Ryan Dudderar, Tyler E. Cragg, POTTER ANDERSON & CORROON, LLP, Wilmington, DE; Akiva Shapiro, Grace E. Hart, Harris Mufson, GIBSON, DUNN & CRUTCHER LLP, New York, NY – Attorneys for Plaintiffs Edelman Financial Engines LLC and Edelman Financial Engines, L.P.

Brian Egan, Cameron P. Clark, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Douglas M. Weems, Michael W. Seitz, SPENCER FANE LLP, Kansas City, MO – Attorneys for Defendant Prime Capital Investment Advisors, LLC

May 21, 2026
Wilmington, Delaware



**NOREIKA, U.S. DISTRICT JUDGE**

Restrictive covenants are promises.  In this case, Plaintiffs allege that Defendant convinced two of Plaintiffs' financial planners to break their promises when they moved to Defendant.  The Court previously entered a TRO to preserve the status quo.  After expedited discovery and a preliminary injunction hearing, the Court now converts that TRO into a preliminary injunction and imposes additional restrictions to maintain the status quo through trial.  This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

I.    **BACKGROUND**

A.    **The Parties**

Plaintiffs Edelman Financial Engines LLC and Edelman Financial Engines, L.P. (collectively, "Edelman") compete with defendant Prime Capital Investment Advisors ("Prime") in the financial planning space.  Edelman Financial Engines LLC is a Delaware LLC with its principal place of business in Massachusetts.  (D.I. 45 ¶ 13).  It is wholly owned by Edelman Financial Engines, L.P., which is a Delaware limited partnership.  (*Id.*).  Prime is a Kansas LLC with its principal place of business in Kansas.  (D.I. 15 at 2).

B.    **History of this Litigation**

The Court previously issued a temporary restraining order, which outlines the history of this litigation.  (D.I. 60 at 1–2).  In short, Edelman's initial complaint accused Prime of inducing financial planners to breach their covenants with Edelman and join Prime.  After the complaint was filed, Prime allegedly continued to do so (with the subjects of the current motion, Joan Greenspon and Amanda Salyer).  (*Id.*).  The Court issued a TRO and ordered the parties to engage in expedited discovery before a preliminary injunction hearing, which was held on April 23, 2026. (D.I. 62).

1

At the preliminary injunction hearing, both sides presented witnesses and evidence. Brian Lipps and Bryan Clark testified live on behalf of Edelman. Amanda Salyer, Joan Greenspon and Glenn Spencer (Prime's CEO) testified live on behalf of Prime. The Court also heard argument about the evidence presented and whether it supports granting a preliminary injunction here.

### C.    Evidence Presented at the Preliminary Injunction Hearing

#### 1.    Relevant Provisions in Greenspon and Salyer's Contracts

In their testimonies, both Greenspon and Salyer admitted that they "voluntarily entered into a restrictive covenant agreement with Edelman." (D.I. 129 at 74:7–9, 118:2–5). Greenspon's relevant restrictive covenants are Plaintiffs' exhibits 110 and 112. (*Id.* at 74:10–23). Those covenants are dated January 2016 and December 2019, respectively. (Plfs.' Ex. 110 at EFE0000690; Plfs.' Ex. 112 at EFE0000667). In her 2016 agreement, which is governed by Delaware law (Plfs.' Ex. 110 § 11(c)), Greenspon agreed to "client non-solicit,[1] employee non-solicit,[2] confidentiality,[3] and return of company property"[4] provisions. (D.I. 129 at 75:7–15). Greenspon also agreed not to accept business from Edelman's clients should she leave Edelman.[5]

---

1    (Ex. 110 §§ 4(b)(1)–(2)).

2    (Ex. 110 § 4(b)).

3    (Ex. 110 §§ 1(a), 4(b)(3)).

4    (Ex. 110 § 3).

5    (Ex. 110 § 4(b)(2)). During the preliminary injunction hearing, Greenspon appeared to think her restrictive covenant did not have a non-acceptance provision (D.I. 129 at 57:17–19, 72:25–73:5); however, in § 4(b)(2) she agreed to not "divert *or accept* any business of the same or similar nature to the Business of EFS with or from any Client or Potential Client whom Employee has solicited (directly or indirectly), with whom Employee has worked, communicated or dealt during Employee's term of employment hereunder, or any other Client that received services from the office, branch or principal work location at which Employee was employed during Employee's employment[.]"

Greenspon's non-solicit and non-acceptance provisions last fifteen months.  (Plfs.' Ex. 110 § 4(e)(1)).  In that agreement, Greenspon agreed that "it may be impossible to assess the damages caused by Employee's violation of this Agreement" and that violating the agreement would "constitute immediate and irreparable injury to [Edelman]."  (*Id.* § 10(a)).  The 2019 agreement, which is governed by Pennsylvania law, contained similar provisions.  (*See* Plfs.' Ex. 112 §§ 1(a), 3, 4(b), 4(e)(1), 10(a), 11(c)).

Salyer's relevant restrictive covenants are Plaintiffs' exhibits 2 and 5.  (D.I. 129 at 118:9–12, 118:21–25).  Salyer's agreements, which are governed by Pennsylvania law (Plfs.' Ex. 2 § 6), contain similar restrictions to Greenspon's, except Salyer's non-solicit provision is limited to twelve months, and her non-acceptance provision is eighteen months.  (D.I. 129 at 119:6–23; Plfs.' Ex. 2 § 3; Plfs.' Ex. 5 §§ 2(a)–(b), 4(b), 6).  Like Greenspon, Salyer agreed that breaching her obligations under these agreements would cause Edelman "substantial and irreparable harm." (Plfs.' Ex. 5 § 9(e)).

Prime was aware of Greenspon and Salyer's agreements because Greenspon and Salyer provided them to Prime.  (D.I. 129 at 75:20–22, 119:24–120:1).

### 2.    Greenspon and Salyer's Move to Prime

On February 13, 2026 (months after the original complaint was filed based on allegations of similar conduct involving financial planners), two more of Edelman's financial planners (Joan Greenspon and Amanda Salyer) resigned from Edelman and joined Prime.  (*Id.* at 55:21–22; *id.* at 106:12–13).  Evidence presented at the preliminary injunction hearing showed that this move was long in the making.  As early as October 2025, Salyer and Greenspon were texting each other about joining Prime, noting that "Prime is running a whole legal playbook" and that "they [Prime] cover everything[.] Sue before tro."  (Plfs.' Ex. 167 at PCIA-Delaware007502).  They also noted that Prime has "the process down" of recruiting Edelman's financial planners, even noting that one

other planner who left Edelman for Prime "did it perfectly and carefully and didn't need to pay a settlement." (*Id.* at PCIA-Delaware007501–7502). In a text exchange a month later, Greenspon told Salyer that "Primes transition plan is key then[.] We need to take good notes bc everyone has moved a lot in a short time period." (Plfs.' Ex. 170 at PCIA-Delaware007576).

When the two resigned, they did it by snail mailing their resignation letters to California over a holiday weekend. (D.I. 129 at 99:24–100:1, 126:5–7). Prime selected the "long three-day weekend" for Greenspon and Salyer to resign. (*Id.* at 122:11–14). This gave Prime "more time to reach out to Edelman's clients before [Edelman] realized" Salyer and Greenspon had resigned. (*Id.* at 123:22–124:6; *see also* Plfs.' Ex. 174 ("There are only so many 3 day weekends? It was mentioned that these are good weekend to transition so that's how we arrived at the 2/13 date.")).

Testimony at the preliminary injunction hearing showed that both Greenspon and Salyer worked directly with Prime to coordinate their move. For example, on December 3, 2025, Greenspon had an in-person "legal meeting with Prime" including its CEO (Glenn Spencer), Director of M&A and Advisor Recruiting (Grant Spencer) and outside counsel that represented Prime. (D.I. 129 at 75:23–76:2). Around that same time, Greenspon "made Prime aware of [her] agreements with Edelman." (*Id.* at 75:20–22). In fact, Greenspon "e-mailed copies of [her] Edelman agreements to Prime" during the December 3, 2025 meeting. (*Id.* at 77:21–23). So did Salyer. (*Id.* at 119:24–120:1). It later came out that "Grant Spencer [(Prime's Director of M&A and Advisor Recruiting)] told [Salyer] to disregard [her] notice obligation to Edelman." (*Id.* at 127:14–16).

During this process, Salyer noted that transitioning from Edelman "is going to be a big pain in the ass so it's gotta be worth it." (Plfs.' Ex. 170 at PCIA-Delaware007573). Ultimately,

Greenspon received a $1,250,000 "goodwill deposit" from Prime. (D.I. 129 at 86:3–6). Salyer received $750,000 as an "upfront payment from Prime." (*Id.* at 132:3–6).

### a.    Greenspon's Testimony

Greenspon testified that, before resigning from Edelman, she "took photos of Edelman's confidential client lists from its password protected sales force database" with her personal phone. (D.I. 129 at 78:4–7, 79:3–5; *see also* Plfs.' Exs. 118–120, 131, 132, 154–163). Those pictures "captured individualized assets under management for each Edelman client," and included clients who lived in Delaware, at least some of whom have now transitioned to Prime. (D.I. 129 at 79:6–11, 80:4–10). Greenspon agreed that "assets under management is not publicly available," and that "AUM [(assets under management)] is highly valuable to a competitor because they can see who the priority client targets are." (*Id.* at 82:15–83:7). Greenspon provided Prime the pictures she took from Edelman's salesforce database, which included client lists, client preferred email addresses, cell phone information, work phone information, contact information, and individualized assets under management. (*Id.* at 83:14–15, 86:7–12). It is unclear whether Greenspon still retains access to those photographs. (*Id.* at 193:20–25).

Greenspon testified that, upon resigning from Edelman, she began emailing her Edelman clients about her move to Prime and followed up with those clients via "phone, email, or in person." (*Id.* at 87:17–19). The initial email Greenspon sent to her clients telling them of her departure for Prime stated:

5

Hello,

I am writing to inform you of a recent change in my professional affiliation. As an investment adviser representative, I am committed to upholding my fiduciary duty and ensuring transparency with my clients. This includes disclosing material information that a reasonable client might consider important when deciding whether to engage or continue engaging in investment advisory services from myself or my prior firm.

I would like to announce that I have recently resigned from Edelman Financial Engines and I have joined Prime Capital Financial.

Best,

Joan Greenspon

(*See, e.g.*, Plfs.' Ex. 85 at PCIA-Delaware002781–82). The email was sent from Greenspon's Prime account and provided Greenspon's contact information at Prime. (*Id.*). Greenspon testified that Prime provided her the email to send to her clients and that she "sent the same e-mail to every Edelman client as provided by Prime without editing it." (D.I. 129 at 86:13–87:4). She also informed some clients of her non-solicit and encouraged them to reach out to other clients, stating that "[b]ecause I [(Greenspon)] have a non-solicit agreement with Edelman, it is important that everyone reach out to me." (Plfs.' Ex. 88 at 2; D.I. 129 at 91:16–92:1). Greenspon also testified that, after she moved to Prime, she "proactively invited" at least one "Edelman client to reach out and have a discussion about if they wanted to move to Prime." (D.I. 129 at 90:17–20; Plfs.' Ex. 85; *see also* Plfs.' Ex. 43). To other Edelman clients, Greenspon stated "that fees were lower at Prime," which Greenspon agreed "would be an inducement to move." (D.I. 129 at 94:12–22; Plfs.' Ex. 78 ("Fees are slightly lower here at Prime . . . .")). And to that same client Greenspon stated that the new planner they were assigned at Edelman "doesn't have as much experience," which Greenspon also agreed constituted inducement. (D.I. 129 at 93:4–94:2; Plfs.' Ex. 78). Other clients expressed worry about a lawsuit, wondering if they "c[ould] be negatively affected if it

6

goes the wrong way." (D.I. 129 at 95:3–20; Plfs.' Ex. 81). Greenspon assuaged that client's concern noting that "we do not expect" the lawsuit to come out "the wrong way" and that "[t]he size of [the] lawsuit is very minor compared to Prime's overall size and revenue." (Plfs.' Ex. 81).

Other clients appeared to understand Greenspon's outreach as solicitation. One responded to the email that they "would like to move forward with [Greenspon]." (Def.'s Ex. 31). Another left a voicemail, stating "we're all in a panic" while also confirming "[w]e want to follow you wherever you are, so please give me a call." (Def.'s Ex. 30).

Greenspon testified that she believes that she had a fiduciary duty to inform her clients about a change in firms because she is "a certified financial planner" and as "part of the code of ethics for the Certified Financial Planning board, [she is] required to notify the people that [she] serve[s] about a change of business location and share with them information about the new offerings that [she has] so that they can make an informed decision about whether or not they want to continue working with [her]." (D.I. 129 at 58:9–17). As evidence that she has such a duty, Greenspon pointed to the "Duty of Loyalty" and the "Updating Information" portions of the CFP Board's Code of Ethics and Standards of Conduct. (*Id.* at 59:13–60:10; Def.'s Ex. 19 at 3, 6).

Greenspon testified that "at least $300 million in [assets under management] of Edelman's clients that [she] serviced have moved to Prime." (D.I. 129 at 80:17–20). Of the $300 million in assets under management, $50 million "originated from client leads that were generated and provided to [Greenspon] by Edelman." (*Id.* at 80:21–25). "[T]he remaining 250 million in [assets under management] that has transferred from Edelman to Prime with [Greenspon]" came from "referrals from those client leads." (*Id.* at 81:1–21).

### b.    <u>Salyer's Testimony</u>

Salyer's testimony largely mirrored Greenspon's. Salyer testified that, before resigning from Edelman and using "Edelman's password protected sales force database," she handwrote

"Edelman's confidential client information in a personal notebook." (*Id.* at 131:9–18, 134:23–25; Plfs.' Ex. 103). Salyer organized her handwritten list "from most to least assets under management" and wrote the highest amount at the top of each page. (D.I. 129 at 117:16–18, 134:17–21). Despite initially testifying she did not use "AUM [(assets under management)] information that appeared in [her] notes" for anything other than organization, Salyer clarified that she used this organization as "the order in which [she] was reaching out to clients." (*Id.* at 114:25–115:15). Put differently, it appears Salyer used this information to prioritize her outreach by contacting her former Edelman clients in order of descending assets under management. Salyer's handwritten notes also include Edelman's clients' names, phone numbers, [and] e-mails. (*Id.* at 134:13–16). Her list reflected "well over 200 Edelman clients," including clients in Delaware. (*Id.* at 135:1–5). It appears that Salyer handwrote this list because "Grant Spencer [(Prime's Director of M&A and Advisor Recruiting)] told [her] he needed [her] Edelman's client information to contact them when [Salyer] resigned." (*Id.* at 133:21–24). "[Salyer] gave this handwritten list to Prime the day [she] resigned," after which Prime worked "to digitize" the handwritten list. (*Id.* at 135:9–11, 136:23–137:2). Salyer agreed that "[b]y failing to return all client contact lists of Edelman's clients, [she] breached her CIIA." (*Id.* at 135:23–25).

Also before resigning from Edelman, Salyer e-mailed Prime pictures of her "planner compensation agreement,"[6] which "contains details and confidential fee structure information for Edelman's planners." (*Id.* at 121:4–10, Plfs.' Ex. 39). In the cover email attaching her planner compensation agreement, Salyer apologized "for the grainy pages" which resulted from "using

---

[6]     There are four attachments to the email with Salyer's planner compensation agreement. Those attachments are: (1) "Addendum to Confidential Info.pdf," (2) "EFE Confidential Info and Invention Assignment Agreement.pdf," (3) "EFE Information Protection Policy.pdf," and (4) "EFE Planner Comp Agreement 2026.pdf." (Plfs.' Ex. 39).

[her] phone to take pictures so as not to raise any hints internally." (Plfs.' Ex. 39). Prime thanked Salyer for sending the documents over and stated "[w]e have shared with the attorneys!" (*Id.*). Additionally, the week before she resigned, Prime sent Salyer "marketing materials and talking points to use with Edelman's clients." (D.I. 129 at 128:21–24).

When Salyer resigned, she began contacting the clients she served at Edelman using the list she created from Edelman's password-protected salesforce database. (*Id.* at 128:8–13). Salyer sent the same email to each client, and "Prime drafted that e-mail for Salyer." (*Id.* at 128:12–17). The initial e-mail Salyer sent to her clients stated:

> Hello,
>
> I am writing to inform you of a recent change in my professional affiliation. As an investment adviser representative, I am committed to upholding my fiduciary duty and ensuring transparency with my clients. This includes disclosing material information that a reasonable client might consider important when deciding whether to engage or continue engaging in investment advisory services from myself or my prior firm.
>
> I would like to announce that I have recently resigned from Edelman Financial Engines and I have joined Prime Capital Financial.
>
> With sincere and kind regards,
>
> Amanda Salyer

(Def.'s Ex. 32; D.I. 129 at 109:14–17). After Salyer's initial outreach to her former Edelman clients, Prime conducted analytics to determine "which clients opened the email and which did not." (D.I. 129 at 137:16–19; Plfs.' Ex. 74). One client responded to Salyer's initial email stating they were "[s]orry" Salyer was leaving Edelman and giving her "[b]est wishes with [her] new firm." (Plfs.' Ex. 173). Salyer followed up stating that she was "working through the weekend to connect with all [her] clients" and asked if there was "a good time to call." (*Id.*). In an email to a different client, Salyer compared Prime and Edelman's fee structure, indicating that if the client

9

transitioned to Prime it would "sav[e] on fees." (D.I. 129 at 139:5–9; Plfs.' Ex. 172).  And just as with Greenspon, some clients understood her email to be a solicitation. (*See*, *e.g.*, Def.'s Ex. 32 (client stating "[w]e'd like to stay with you")).

Salyer stated that, like Greenspon, she believes that she had a fiduciary duty to inform her clients about a change in firms.  (D.I. 129 at 108:16–18, 110:15–18).  Salyer said she believed she needed to contact her former clients because, based on her experience with how Edelman handled departing advisors, she "did not believe that [Edelman] w[as] going to provide [her] contact information, so [she] felt it was [her] duty to send fiduciary notices so they [(Salyer's former clients)] had [her] contact information." (*Id.* at 109:3–10).  Salyer adopted Greenspon's testimony regarding the CFP Board's Code of Ethics and Standards of Conduct.  (*Id.* at 110:15–18).

Salyer testified that, as of the date of the preliminary injunction hearing, "over a hundred of [her] clients moved to Prime," representing "over 84 million in assets under management." (*Id.* at 138:4–9).  Salyer agreed that "[u]nlike most financial firms, Edelman provides planners with financial leads." (*Id.* at 133:10–12).  Indeed, Salyer "received a fair amount of [her] clients at Edelman through [Edelman's] engagement center" and "through departed and retiring Edelman planners." (*Id.* at 133:13–18).

In addition to convincing her Edelman clients to transfer their business to Prime, Salyer sought Prime's advice on how to "start [a] conversation with [her] CSA [(support team)] so she can have [an] offer in hand and start at [the] same time assuming she accepts." (Plfs.' Ex. 174).  Salyer also expressed legal concerns about reaching out to her CSA, asking if there was "a certain way to do this that protects me/Prime legally" and whether Prime would "protect our CSAs if any legal issue arises to them." (D.I. 129 at 139:15–140:9; Plfs.' Ex. 174).  In that same email, Salyer

asked about "[l]egal for me and Joan," and then sought to negotiate "higher goodwill," pointing to her "significant future pipeline built into [her] book." (Plfs.' Ex. 174).

### 3.    Live Testimony from Other Witnesses

#### a.    Brian Lipps

Lipps is Edelman's Regional Director of Financial Planning and has been with the company for thirteen years. (D.I. 129 at 7:1–16). He supervised Greenspon and Salyer while they were at Edelman. (*Id.* at 7:24–8:1). He testified about Edelman's business model, including how its financial planners develop clients to work with. (*Id.* at 9:15–11:4). He testified about the resources Edelman provided Greenspon and Salyer, so they could develop client relationships and expand their books. (*Id.* at 12:6–22, 16:1–15).

Lipps testified that he learned of Greenspon and Salyer's departure on February 13, 2026 (the same day they mailed their resignation letters via U.S. mail) because Edelman "monitor[s] registrations so if somebody leaves, [] we know fairly soon within hours of that [] happening." (*Id.* at 18:7–18). Lipps testified that hundreds of clients previously serviced by Greenspon and Salyer have left since their resignations, which has caused Edelman to lose a significant amount of assets under management. (*Id.* at 18:20–19:5). In addition, Lipps testified that losing Greenspon and Salyer has harmed Edelman because Edelman "encourage[s] planners to generate new clients, bring on new clients through referrals," and when "referring clients decide to leave, that is no longer a source of new business for [Edelman]." (*Id.* at 19:6–20:14). Lipps also testified that when clients leave, it prevents Edelman from expanding their services to those specific clients and that when departing planners leave "abruptly without any notice to anybody" it hurts Edelman's reputation because it "creates a tremendous amount of chaos and uncertainty," which is "really unsettling to clients." (*Id.*).

### b.    Bryan Clark

Bryan Clark is Edelman's VP of Planners.  (*Id.* at 37:11–15).  Clark testified about how Edelman transitions clients when their planner resigns.  (*Id.* at 37:16–38:20).  He also testified that Edelman has a fiduciary duty to put its clients' interests ahead of its own, and that Edelman views clients as "Edelman's" clients, not clients of the respective planner servicing them.  (*Id.* at 42:9–43:11, 45:7–11).  In the same vein, he testified that nothing prohibits a client from leaving Edelman for another financial services firm.  (*Id.* at 46:8–47:6).

Clark was confronted with an expert report from a Mr. Finch that Edelman prepared in a separate case about a departed planner, Tim Dowden, a case Clark was involved in.  (*Id.* at 47:17–48:7; *see* Def.'s Ex. 2).  "Mr. Finch was specifically retained by Edelman to calculate damages in the Dowden case," and Clark had "no criticism of [Mr. Finch's] opinions."  (D.I. 129 at 48:8–12).  Clark agreed that "Edelman can calculate the damages sustained with the losses of [Greenspon and Salyer's] clients" and that he is "personally not aware of any difference between the Dowden situation and the Greenspon and Salyer situation."  (*Id.* at 48:13–16, 48:22–25).

### c.    Glenn Spencer

Glenn Spencer is Prime's CEO.  (*Id.* at 143:13–19).  He is "responsible for building Prime Capital Investment Advisors, growing the organization and operating it profitably, [and] developing services that are appealing to clients and financial advisers."  (*Id.* at 143:15–19).  He has grown the organization through "twenty different acquisitions" and "recruit[ing] new people to the platform."  (*Id.* at 143:20–144:3).  He stated that in the company's eight years of business it has "been investing pretty heavily in building out the capabilities of the organization."  (*Id.*).

Glenn Spencer also testified about financial planners notifying their clients when they move firms and provided an example notice email that Prime sends to clients when its own planners leave.  (*Id.* at 147:19–24; Def.'s Ex. 21).  Glenn Spencer testified that he does not believe

someone's name, address, telephone number, and contact information is confidential. (D.I. 129 at 149:6–24). He did, however, agree that assets under management is not public and that he was unaware that assets under management information was taken in this case. (*Id.* at 149:25–150:25). He also testified that he did not realize that Greenspon and Salyer had information regarding assets under management in their possession until his deposition a week and a half before the preliminary injunction hearing. (*Id.* at 151:1–5). As for that, he stated: "I don't like the fact that AUM was taken." (*Id.* at 150:18–25).

Glenn Spencer agreed that Edelman has a legitimate business interest in protecting its client relationships and confidential information. (*Id.* at 154:12–17). He also testified that Prime's own financial planners enter into non-solicitation and non-compete agreements with Prime. (*Id.* at 155:24–156:17; *see also* Plfs.' Exs. 7 (Salyer's restrictive covenant with Prime) § 7, 107 (Greenspon's restrictive covenant with Prime) § 7). And although he described the non-compete as a "notice" provision (D.I. 129 at 156:7–17), by its terms, it appears to be a true non-compete that, at a minimum, lasts ninety days. (Plfs.' Ex. 7 § 7 ("Member will not (i) engage in . . . the Business as conducted by Member as of the date hereof or during the term of this Agreement, anywhere in the United States . . . [for] ninety (90) days from the date of termination of this Agreement[.]"). He added that Prime is following the Court's temporary restraining order "to a T." (D.I. 129 at 158:12–13).

### 4. <u>False Declarations and Credibility</u>

Before the Court ordered expedited discovery, Greenspon and Salyer submitted sworn declarations in opposition to Edelman's motion for a preliminary injunction. (D.I. 44-1, Exs. 1,

2).  Expedited discovery revealed that Greenspon's and Salyer's declarations contained false statements.[7]

For example, Greenspon's declaration stated: "I do not have possession of any EFE client information (such as account numbers, investor preferences, or other financial information) other than basic contact information used to make the initial communications."  (D.I. 44-1, Ex. 1 ¶ 8). When Greenspon made that statement, however, she had, on her personal phone, photographs of Edelman's password-protected salesforce system, which included "individualized assets under management for each Edelman client."  (D.I. 129 at 79:3–8, 84:21–85:6; *see also* Plfs.' Exs. 118– 120, 131, 132, 154–163).  Greenspon later conceded that assets under management constitutes financial information (which makes sense because assets under management is denoted by a dollar sign) so she did have Edelman financial information in her possession.  (D.I. 129 at 84:21–85:6). Greenspon's declaration also stated: "After telling a customer about my departure and providing my new contact information, I did not contact any client again on my own initiative. The only time I made follow-up calls, sent follow-up emails, or met with a client was after that client voluntarily and without solicitation requested a follow-up with additional information, or told me that they wanted to move their business to me at Prime Capital."  (D.I. 44-1, Ex. 1 ¶ 9).  Expedited discovery, however, revealed that statement was likewise false.  (D.I. 129 at 91:2–15; *see, e.g.*, Plfs.' Ex. 85).

Like Greenspon, Salyer's prior declaration contained statements (1) that she did not have possession of any EFE client information, including financial information and (2) that she did not

---

[7]  Greenspon and Salyer submitted corrections to their prior declarations two days before the preliminary injunction hearing.  (D.I. 95).  But even those corrections failed to fully correct their original declarations.  (D.I. 129 at 130:2–131:8 (Q. So that statement that you were not considering leaving EFE was not true, correct? A. Correct.)).  To date, Prime has not submitted any additional corrections to the declarations to fully correct the false statements Greenspon and Salyer made to the Court under the penalty of perjury.

contact clients on her own initiative after the initial outreach. (D.I. 44-1, Ex. 2 ¶¶ 8, 9). As with Greenspon, expedited discovery revealed those statements to be false. (*See*, *e.g.*, Plfs.' Ex. 103 (Salyer's handwritten notes, which include assets under management); D.I. 95-1, Ex. 2 ¶¶ 6–7). Salyer conceded she falsely stated that she did not retain Edelman's financial information (D.I. 129 at 136:20–21), but tried justifying it because she "did not initially think that AUM was financial information." (*Id.* at 115:17–21; D.I. 95, Ex. 2 ¶ 5). That justification is not credible because Salyer's own handwritten notes denote assets under management as a dollar figure (Plfs.' Ex. 103), and it is hard to believe that a financial planner did not realize that a dollar-figure-denoted amount constitutes financial information.

In addition to the false statements in their declarations, Greenspon and Salyer were impeached multiple times with deposition testimony during the preliminary injunction hearing. (*See*, *e.g.*, D.I. 129 at 93:4–94:2, 95:24–96:22, 121:14–122:17, 122:24–124:6, 127:1–16).

## II.    <u>LEGAL STANDARD</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must show (1) a likelihood of success on the merits; (2) irreparable harm absent preliminary relief; (3) that the balance of the equities are in its favor; and (4) that the public interest is supported by the relief. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024); *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). Although the party seeking a preliminary injunction must prove its case by "a clear showing" (*Del. State Sportsmen's Ass'n*, 108 F.4th at 202 (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam))), it must prove the second factor (irreparable harm) by a preponderance of the evidence. *Reilly*, 858 F.3d at 179. As the Third Circuit recently reiterated, "[t]he 'purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the

15

merits can be held.'" *Del. State Sportsmen's Ass'n*, 108 F.4th at 200 (quoting *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024)).

## III.    DISCUSSION

### A.    Likelihood of Success[8]

#### 1.    Tortious Interference with Contract

To demonstrate likelihood of success on the merits, Plaintiffs need only show that their argument has a "reasonable probability of success – odds that are significantly better than negligible but not necessarily more likely than not." *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 218 (3d Cir. 2025) (citing *Reilly v. City of Harrisburg,* 858 F.3d 173, 176, 179 (3d Cir. 2017)) (internal quotations omitted).  For the tortious interference with contract claim, Edelman must show it has a reasonable probability of success showing "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013); *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1266 (Del. 2004).  Here, Prime only contests the first, third, and fourth prongs. (D.I. 42 at 9–13).

#### a.    Whether There Was a Valid, Enforceable Contract

Edelman has met its burden to show a reasonable probability of success that it had valid and enforceable contracts with Greenspon and Salyer.  Those contracts were introduced at the hearing (Plfs.' Exs. 2, 5, 110, 112), and both Greenspon and Salyer agreed that they "voluntarily

---

[8]    The Court previously addressed Prime's procedural arguments, and the Court's analysis there has not changed in the interim.  (D.I. 60 at 6–9).  Prime indicated that it would re-file its motion to dismiss for lack of personal jurisdiction, and the Court will address that motion if it is filed.  (D.I. 129 at 198:18–23).

entered into a restrictive covenant agreement with Edelman." (D.I. 129 at 74:7–9, 118:2–5). From an offer, acceptance, and consideration standpoint, it is reasonably probable that Edelman's contracts with Greenspon and Salyer are valid.

Prime's main fight here is not with offer, acceptance and consideration; it is with the actual covenants themselves. But as the Court found, "both Delaware and Pennsylvania courts uphold sub-two-year non-solicitation and confidentiality agreements." (D.I. 60 at 11 (citing *Sensus USA, Inc. v. Franklin,* No. 15-742 (RGA), 2016 WL 1466488, at *7 (D. Del. Apr. 14, 2016) (upholding two-year non-solicitation and confidentiality agreement because "Delaware courts have consistently found that two-year restrictions on covenants not to compete are reasonable"); *Synthes USA Sales, LLC v. Harrison*, No. 11-12021 (MLT), 2014 WL 11210394, at *12 (Pa. Com. Pl. May 19, 2014) (upholding non-solicitation and confidentiality agreement because "Pennsylvania courts have upheld restrictive covenants for terms of up to three years or more after employment ends."))). In light of this, Edelman has met its burden to show on the current record a reasonable probability of success that the non-solicitation and confidentiality provisions are enforceable.

As to the non-acceptance provisions, Pennsylvania law requires "examin[ing] and balance[ing] the employer's legitimate business interest, the 'individual's right to work, the public's right to unrestrained competition, and the right to contract . . . in determining whether to enforce a restrictive covenant.'" *Synthes USA*, 2014 WL 11210394, at *7 (quoting *Hess v. Gebhard & Co.*, 808 A.2d 912, 917 (Pa. 2002)). The analysis under Delaware law is substantially the same. *See Sensus USA,* 2016 WL 1466488, at *7. Things like confidential information, trade secrets, customer goodwill, and investments in employees are legitimate business interests. *Synthes USA*, 2014 WL 11210394, at *7–*11. "Additional protectable business interest [] include those that 'relate to an employee's special skills; the safeguarding of customer goodwill;

17

proprietary business information, including processes, trade secrets, and inventions; as well as the time and resources the employer has invested in the training of its employees.'" *USI Ins. Servs. Nat'l, Inc. v. Frieman*, 2022 WL 390662, at *11 (Pa. Super. Ct. 2022) (quoting *Socko v. Mid-Atl. Sys. of CPA, Inc.*, 126 A.3d 1266, 1273 (Pa. 2015)). "[T]he time and expense to develop a client" is also a protectable business interest, which "an employer may have and seek to protect through a restrictive covenant." *USI Ins. Servs. Nat'l.,* 2022 WL 390662, at *11.

Although the Court previously stated that "the non-acceptance provisions in Greenspon and Salyer's contracts go beyond what is necessary to protect Edelman's interests and would not survive a balance of the equities because these provisions prohibit consumers from accessing and working with a financial planner of their choice" (D.I. 60 at 12), evidence from the preliminary injunction hearing has caused the Court to rethink that determination. To start, Edelman has shown that it invested significant resources into providing the infrastructure and leads, which allowed Greenspon and Salyer to develop their books of business. As Edelman's Regional Director of Financial Planning (Brian Lipps) testified, unlike other financial services companies, "Edelman does not require its financial planners to develop their own clients." (D.I. 129 at 9:15–17). Instead, Edelman provides its planners with leads, transitions books of retiring planners to new planners and transitions books of departing planners to new planners. (*Id.* at 9:18–11:4). Salyer agreed that Edelman's approach is "[u]nlike most financial firms." (*Id.* at 133:10–12).

Both Greenspon and Salyer benefited from Edelman's support. For Greenspon, Edelman developed leads, provided her infrastructure "to help with operational service issues," provided "financial planning tools," and provided "an investment management team that made all of the investment decisions for all these clients." (*Id.* at 12:6–22). Additionally, Greenspon testified that $50 million of her book "originated from client leads that were generated and provided to

18

[Greenspon] by Edelman." (*Id.* at 80:21–25). "[T]he remaining 250 million in [assets under management] that has transferred from Edelman to Prime with [Greenspon]" came from "referrals from those client leads." (*Id.* at 81:1–21; *see also id.* at 13:4–15). For Salyer, Edelman provided leads and an initial client base. (*Id.* at 16:1–15). For example, Salyer "inherited clients from at least one retiring planner" and "from terminated planners." (*Id.*; *id.* at 133:13–18). Salyer also "received a fair amount of [her] clients at Edelman through [Edelman's] engagement center." (*Id.* at 133:13–18). Ultimately, both Greenspon and Salyer were each able to develop a book of business after Edelman invested considerable resources that gave them the infrastructure and resources that allowed them to focus on servicing their clients.

Edelman's investment, and the client relationships and goodwill facilitated by that investment, are protectable business interests. *USI Ins. Servs. Nat'l.,* 2022 WL 390662, at *11; *Weichert Co. of Pa. v. Young,* Case No. 2223-VCL, 2007 WL 4372823, at *4 (Del. Ch. Dec. 7, 2007) (companies have an interest in the goodwill created by their sales representatives); *see also id.* n.23 (collecting cases). The non-acceptance provision protects Edelman's legitimate interest in the investment it made in Greenspon and Salyer as well as the client relationships and goodwill facilitated throughout that investment by giving Edelman a meaningful opportunity to transition client relationships and goodwill to a different planner, and then, if a client wishes to return to Greenspon or Salyer after the restricted period ends, they may.

Moreover, Edelman has a legitimate business interest in its confidential information, including the information that resides in its internal databases. *WellSpan Health v. Bayliss*, 869 A.2d 990, 996 (Pa. Super. 2005) ("The type of interests that have been recognized in the context of a non-competition covenant include . . . confidential information[.]"); *Elite Cleaning Co. v. Capel*, Case No. 690-N, 2006 WL 1565161, at *4 (Del. Ch. June 2, 2006) ("Interests which the

19

law has recognized as legitimate include [] protection of employer confidential information from misuse."). The non-acceptance provision acts as a safeguard to ensure departing planners cannot pilfer that system and weaponize Edelman's own confidential information against it to take Edelman's clients.

Certainly, Greenspon and Salyer both have a right to work and a right to earn a living. But enforcing the non-acceptance provision at this time does not preclude Greenspon and Salyer from working as financial advisors, even if it makes it more difficult to expand their books. The non-acceptance provision merely prohibits them from accepting their former clients for a specific timeframe, and when that timeframe is up, Greenspon and Salyer are more than free to onboard their former clients.

Edelman has carried its burden to show a reasonable probability of success that it had valid and enforceable contracts with Greenspon and Salyer.

### b.     Whether There Was an Intentional Act Causing Breach

> In cases like this, this factor asks whether the defendant "intentionally acted in a way that significantly contributed to" an employee breaching their restrictive covenant with a former employer. *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC,* No. 3718 (VCP), 2010 WL 338219, at *13 (Del. Ch. Jan. 29, 2010). Implicit in this factor is that the former employee breaches their restrictive covenant, and that is where the fight under this factor lies.

(D.I. 60 at 12). Evidence at the preliminary injunction hearing established that it is reasonably probable that Greenspon and Salyer breached multiple contract provisions: (1) confidentiality provisions, (2) customer non-solicitation provisions and (3) non-acceptance provisions.[9]

---

[9]     The parties discussed other provisions in Greenspon and Salyer's restrictive covenants, including the employee non-solicit and Salyer's four-weeks' notice provision; however, the Court need not address those provisions because Edelman's requested relief is not based on those arguments.

***Confidentiality Provisions.*** Greenspon and Salyer were required to "hold in confidence and refrain from disclosing to any other party all information of a proprietary or confidential nature . . . such as information relating to customers, Clients, Potential Clients, any customer, Client or Potential Client lists, Client or Potential Client financial and personal information . . . ." (Plfs.' Ex. 110 §§ 1(a), 4(b)(3); Plfs.' Ex. 112 §§ 1(a), 4(b); *see also* Plfs.' Ex. 5 §§ 2(a)–2(b) (similar)).

Greenspon agreed that she "did not abide [by her confidentiality] obligations." (D.I. 129 at 83:16–19). She took pictures of Edelman's password-protected salesforce database, which "captured individualized assets under management for each Edelman client," and then provided those photos to Prime. (*Id.* at 83:14–15, 86:7–12). Greenspon was also required to return Edelman's property when she resigned, which includes "all files, records, [and] ***databases***" that she used while at Edelman (Plfs.' Ex. 110 § 3; Plfs.' Ex. 112 § 3); however, Prime's counsel could not represent that Greenspon had purged the pictures of Edelman's database from her phone (D.I. 129 at 193:20–25).

Salyer also agreed that she "ha[s] not maintained the confidentiality" of Edelman's client identities or client list. (*Id.* at 135:12–22). Salyer handwrote out her client list, including assets under management, from Edelman's password-protected salesforce database and then provided that list to Prime. (*Id.* at 131:9–18, 134:23–25, 135:9–11; Plfs.' Ex. 103). And she did this apparently at Prime's request because "Grant Spencer [(Prime's Director of M&A and Advisor Recruiting)] told [her] he needed [her] Edelman's client information to contact them when [Salyer] resigned." (D.I. 129 at 133:21–24). In addition, Salyer emailed Prime pictures of her planner compensation agreement, which "contains details and confidential fee structure information for Edelman's planners." (*Id.* at 121:4–10, Plfs.' Ex. 39).

On this record, the Court finds there is a reasonable probability that Greenspon and Salyer breached confidentiality provisions in their contracts with Edelman.

***Customer Non-Solicitation Provisions.*** Greenspon and Salyer were required not to solicit any of their former clients.  (Plfs.' Ex. 110 § 4(b)(1); Plfs.' Ex. 112 § 4(b)(1); Plfs.' Ex. 5 § 6(b)).  The evidence presented at the preliminary injunction hearing establishes a reasonable probability of success that Greenspon and Salyer breached this provision.  To start, on the day they departed, Greenspon and Salyer sent their clients a nearly identical email (prepared by Prime), which invited them to discuss "whether to engage or continue engaging in investment advisory services from myself ***or my prior firm***."  (*See, e.g.*, Def.'s Ex. 32; Plfs.' Ex. 85).  It is reasonably probable that this is solicitation.  (D.I. 60 at 12–13).

Greenspon was keenly aware of her non-solicit agreement and tried to indirectly solicit clients by convincing one of her former clients to reach out to other former clients of hers.  (Plfs.' Ex. 88 at 2 ("Because I [(Greenspon)] have a non-solicit agreement with Edelman, it is important that everyone reach out to me.")).  But her restrictive covenant barred "directly ***or indirectly***" soliciting her former clients.  (Plfs.' Ex. 110 § 4(b)(1); Plfs.' Ex. 112 § 4(b)).

Additionally, Greenspon admitted that she "proactively invited" at least one "Edelman client to reach out and have a discussion about if they wanted to move to Prime."  (D.I. 129 at 90:17–20; Plfs.' Ex. 85; *see also* Plfs.' Ex. 43).  She also agreed that her statement that fees were lower at Prime constituted an "inducement to move."  (D.I. 129 at 94:12–22; Plfs.' Ex. 78 ("Fees are slightly lower here at Prime . . . .")).  And when another client expressed concern about moving its book to Prime because of a lawsuit, Greenspon allayed those concerns, stating that "[t]he size of [the] lawsuit is very minor compared to Prime's overall size and revenue."  (Plfs.' Ex. 81).  It is reasonably probable that this conduct is solicitation.

As for Salyer, she followed up with one client who had a lukewarm response to her initial outreach asking if there was "a good time to call." (Plfs.' Ex. 173). And like Greenspon, Salyer compared Prime's fee structure to Edelman's, telling a different client they would "sav[e] on fees" by transitioning to Prime. (D.I. 129 at 139:5–9; Plfs.' Ex. 172). It is reasonably probable that this conduct also constitutes solicitation.

Prime's main argument to the contrary is that Greenspon and Salyer had fiduciary duties to notify their clients of a change of employment, which Greenspon and Salyer echoed at the preliminary injunction hearing. (D.I. 129 at 58:9–17, 108:16–18, 110:15–18); *see also United States v. Miller*, 833 F.3d 274, 280 (3d Cir. 2016) ("[I]nvestment advisors have fiduciary duties to their clients."). To support that fiduciary-notice-requirement argument, Greenspon and Salyer pointed to the "Duty of Loyalty" and "Updating Information" portions of the CFP Board's Code of Ethics and Standards of Conduct. (*Id.* at 59:13–60:10, 108:16–18, 110:15–18; Def.'s Ex. 19 at 3, 6). The Duty of Loyalty, however, essentially says that financial advisors must place their clients' interest above their own; it does not say anything about notifying clients of a change in employment. (Def.'s Ex. 19 at 3). The requirement to update information lends some support to Prime's argument; that section requires financial planners "to provide to the Client information that is a Material[10] change[.]" (*Id.* at 6). But assuming (without deciding) Prime's read there is correct, there is no reason why Greenspon and Salyer had to wait until "***after*** the move had been made" to notify their clients. (D.I. 60 at 13). If changing firms is actually a material change that financial advisors need to notify their clients about, it appears that Greenspon and Salyer should have notified their clients when they committed to leave Edelman (*i.e.*, when they signed offer

---

[10]   "Material" is defined later: "Information is material when a reasonable Client or prospective Client would consider the information important in making a decision." (*Id.* at 15).

letters from Prime). (D.I. 129 at 81:22–25, 98:6–8 (Greenspon admitting she signed her Prime offer letter on December 31, 2025)). Regardless, what Greenspon and Salyer did here goes far beyond simply notifying their former clients of a change in employment. (D.I. 60 at 12–13). They compared Prime and Edelman's fee structures to convince clients to transfer their accounts, they proactively reached out to clients to discuss moving accounts to Prime, they quelled clients' concerns about moving their accounts, and they did all this knowing that they agreed to a non-solicit provision in their employment agreement with Edelman.

Edelman has met its burden at this stage to show a reasonable probability of success that Greenspon and Salyer breached the customer non-solicitation provisions in their restrictive covenants.

***Non-Acceptance Provisions.*** Greenspon and Salyer were required not to accept any of their former Edelman clients as clients at Prime. (Plfs.' Ex. 110 § 4(b)(2); Plfs.' Ex. 112 § 4(b)(2); Plfs.' Ex. 2 § 3). At the preliminary injunction hearing, Greenspon and Salyer both agreed they have accepted former clients as clients at Prime (D.I. 129 at 80:17–20, 138:4–9), so it is reasonably likely that they breached this provision as well.

### c.      **Whether Prime Was Justified**

Prime says that Edelman has failed to prove the "without justification" prong because (1) Greenspon and Salyer were required, as fiduciaries, to notify their former clients of a change in employer and (2) Prime is shielded by the competitor business privilege. (D.I. 42 at 11–12). The Court addressed the fiduciary-duty argument above and previously addressed Prime's competitor-business-privilege argument. (D.I. 60 at 14). Neither is availing. The preliminary injunction hearing revealed a sophisticated, well-planned-out scheme to induce Edelman's financial planners to breach their restrictive covenants and lift-and-shift their entire client base to Prime. And to do this, Prime paid Greenspon and Salyer handsomely. (D.I. 129 at 86:3–6, 132:3–

24

6).  Prime has pointed to nothing that justifies inducing a competitor's employees to knowingly breach their restrictive covenants.[11]

### B.      Irreparable Harm

Edelman has shown it is more likely than not that it will suffer irreparable harm absent preliminary injunctive relief.  *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

***First***, by inducing Greenspon and Salyer to breach their restrictive covenants with Edelman, Prime caused Edelman irreparable harm.  *Cleveland Integrity Servs., LLC v. Byers*, Case No. 24-371 (MTZ), 2025 WL 658369, at *17 (Del. Ch. Feb. 28, 2025) ("[A] breached restrictive covenant causes irreparable harm."); *Allied Orthopedic Assocs., Inc. v. Leonetti*, Case No. 18-1566 (JHS), 2018 WL 4051801, at *11 (E.D. Pa. Aug. 24, 2018) ("Under Pennsylvania law, the threat of the unbridled continuation of the violation [of a restrictive covenant] and the resultant incalculable damage to the former employer's business establishes irreparable harm." (quoting *Healthcare Servs. Grp. v. Fay,* 597 F. App'x 102, 103–04 (3d Cir. 2015) (cleaned up))); *Huntington Bancshares Inc. v. Burke*, No. 20-1159 (WSS), 2020 WL 6364755, at *11 (W.D. Pa. Oct. 29, 2020) ("Courts have recognized that a company is irreparably harmed when an ex-employee violates these types of provisions and pursues the company's customers."); *Horizon Pers. Commc'ns, Inc. v. Sprint Corp.,* 2006 WL 2337592, at *20 (Del. Ch. Aug. 4, 2006) ("Damages would not adequately compensate [p]laintiffs for a breach of the confidentiality provisions because the purpose of such provisions is to prevent harm and misuse before it occurs.").

---

[11]     Edelman also moved for a preliminary injunction based on its tortious interference with business relations and unfair competition claims.  (*See* D.I. 34 at 15–16).  But, even assuming a reasonable probability of success on those claims, the Court need not address those arguments because any relief the Court would grant there is less than or the same as what the Court is granting here.

25

***Second***, Edelman provided testimony that when planners leave "abruptly without notice to anybody" it hurts Edelman's reputation and goodwill it has built up with its clients by "creat[ing] a tremendous amount of chaos and uncertainty," which is "really unsettling to clients." (D.I. 129 at 19:6–20:14). Harm to customer relationships and goodwill is irreparable and difficult to quantify. *CentiMark Corp. v. Lavine*, Case No. 11-757 (AJS), 2011 WL 3209106, at *4 (W.D. Pa. July 28, 2011); *see also Healthcare Servs. Grp., Inc. v. Fay*, 597 F. App'x 102, 104 (3d Cir. 2015) (describing interference with "customer relationships" as "'quintessential irreparable injuries' because they implicate indeterminate future losses of clients and revenue"). There is evidence that Edelman experienced that harm here. For example, Greenspon's departure caused uncertainty, with one customer saying they were "in a panic" after learning of Greenspon's departure. (Def.'s Ex. 30). In addition, Greenspon seemed to talk negatively about Edelman's employees to Edelman's clients, stating that the planner that replaced Greenspon "doesn't have as much experience." (Plfs.' Ex. 78). That is the type of statement that harms customer relationships by making customers question whether Edelman's planners have the experience to provide the best financial advice. And both Greenspon and Salyer told their former clients that fees are lower at Prime, which harms the goodwill Edelman built up with its customers by making them think Edelman is price gouging when in reality there could be different reasons for the different price structures. (Plfs.' Exs. 78, 172). Finally, all of this has played out against the backdrop of Greenspon and Salyer convincing former Edelman clients to end their customer relationship with Edelman and move to Prime, which interferes with Edelman's customer relationships. *Huntington Bancshares Inc.*, 2020 WL 6364755, at *11 ("The likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate."). There is ample evidence that Edelman has already suffered

26

significant harm to its goodwill, reputation, and customer relationships, and there is no evidence that additional such harm will stop being inflicted absent a court order.

**Third**, Edelman provided testimony that it provides financial planners with leads and that when those leads convert into clients, they often refer additional clients, which was confirmed by Greenspon's testimony that $250 million of her assets under management came from "referrals." (D.I. 129 at 19:10–14, 81:1–21).  By inducing Greenspon and Salyer to solicit their former clients, Prime has effectively cut off Edelman's ability to expand its business through referrals from those clients.  Prime also cut off Edelman's ability to expand its business with those now-departed clients.  (*Id.* at 19:10–20:14).  As the Court previously stated, this type of harm "is exceedingly difficult, if not impossible to quantify." (D.I. 60 at 14–15).

**Fourth**, Greenspon and Salyer's agreements had stipulations that breach would "constitute immediate and irreparable injury."  (Plfs.' Ex. 110 § 10(a); Plfs.' Ex. 112 § 10(a); Plfs.' Ex. 5 § 9(e)).  Although this is not dispositive, it is additional evidence that Edelman has suffered and is continuing to suffer irreparable harm.  *See TP Grp.–CI, Inc. v. Vetecnik,* No. 16-623 (RGA), 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016) ("Under Delaware law, 'contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing preliminary injunctive relief.'"); *see also CKHS, Inc. v. Prospect Med. Holdings, Inc.*, 329 A.3d 1204, 1217 (Pa. 2025) (permitting trial courts "to consider the parties' contractual agreement as evidence of how they understood the significance of potential anticipated breaches [] and weigh their agreement in favor of finding irreparable harm."); *Allied Orthopedic Assocs.*, 2018 WL 4051801, at *11 ("When determining whether a breach of a restrictive covenant will cause irreparable harm, courts find it relevant that the non-compete agreement expressly states that money damages will be inadequate and that the parties agree to injunctive relief in the event of a breach.").  Indeed,

27

Prime includes similar provisions in its own agreements, indicating that Prime likewise agrees that breaching restrictive covenants constitutes irreparable harm. (*See, e.g.*, Plfs.' Ex. 7 § 7 ("Member therefore acknowledges and agrees [] that the Company Group will be ***irreparably*** damaged if [] Member were to, directly or indirectly, engage in or perform services for any line of business carried on by the Company Group or incidental thereto [] or interfere with the relationship of the Company Group with its clients, financial advisers, member advisers, agents, solicitors, employees, independent contractors, consultants or advisers."); Plfs.' Ex. 107 § 7 (same)).

*Fifth*, there is no evidence that Prime will cease inducing Greenspon and Salyer to breach restrictive covenants with Edelman. Indeed, Prime's counsel could not confirm that Greenspon no longer had access to Edelman's confidential information. (D.I. 129 at 193:20–25); *see AMG Nat. Tr. Bank v. Ries,* Case No. 06-4337 (CJ), 2007 WL 2713218, at *10 (E.D. Pa. Sept. 13, 2007), *aff'd,* 319 F. App'x 90 (3d Cir. 2008) (finding irreparable harm where departing financial planner's "ability to contact [former] clients pose[d] a threat of further significant financial losses"). And given the fact that Prime previously induced Greenspon and Salyer to use Edelman's confidential information to solicit business from Edelman's former clients, there is no guarantee it will stop absent a court order. Moreover, it appears that Prime is intent on pursuing its strategy of poaching Edelman's financial planners and inducing them to breach their contractual obligations to Edelman. (D.I. 99, 101, 106; *see also* D.I. 129 at 143:20–144:3 (Prime's CEO stating Prime has "invested heavily in the business" including by "recruit[ing] new people")). That means future irreparable harm is not just foreseeable; it is likely.

Prime's best argument on irreparable harm is that in a case involving a different financial planner (Tim Dowden) Edelman provided a damages expert report. (D.I. 129 at 47:17–48:7; Def.'s Ex. 2). The gist of the argument is that if Edelman could calculate damages in that case, then harm

28

is not irreparable here. The issue with that argument is that the expert report in question was limited to calculating the "economic losses" that already occurred from Dowden's departure from Edelman. (Def.'s Ex. 2 ¶ 1; *id.* ¶ 12 (stating that the report calculated "economic damages in two ways")). But what that report does not address is the likely non-economic harm to Edelman's goodwill, existing client relationships or future referrals. And that makes sense, because, as the Court stated above, it is difficult, if not impossible, to put a dollar figure to those types of harms.

Thus, Edelman has satisfied the irreparable harm prong.

### C.    Balancing the Equities

On the current record, the balance of the equities favors Edelman. From the beginning, Prime has taken an act-first, ask-for-forgiveness-later approach to hiring Edelman's employees. It knew of Greenspon and Salyer's obligations to Edelman, but there is evidence it induced them to breach anyway. Prime did this even though Prime itself forced Greenspon and Salyer to sign similar restrictive covenants when they joined Prime. (*See* Plfs.' Exs. 7, 107). Then, in its effort to defeat Edelman's preliminary injunction bid, Prime submitted false declarations from Greenspon and Salyer, declarations that *still* contain false statements. *See supra* note 7. And there is evidence that Prime ran this "whole legal playbook" because it has made what it believes is a rational economic decision that it will cost less "to pay a settlement" than it would to compete honestly. (Plfs.' Ex. 167 at PCIA-Delaware007502; Plfs.' Ex. 169 at PCIA-Delaware007549; *see also* Plfs.' Ex. 81 (Greenspon stating that "[t]he size of [the] lawsuit is very minor compared to Prime's overall size and revenue.")).

Moreover, the way Greenspon and Salyer went about departing Edelman raises concerns. Their text messages revealed that they knew "[t]his move is going to be a big pain in the ass so it's gotta be worth it." (Plfs.' Ex. 170 at PCIA-Delaware007573). They "t[ook] good notes," capturing Edelman's confidential information (using methods designed to evade detection) and disclosed

29

that confidential information to a direct competitor. (Plfs.' Ex. 170 at PCIA-Delaware007576; D.I. 129 at 83:11–15 (Greenspon admitting she "provided [Prime] the photos" taken on her personal phone); *id.* at 135:9–11 (Salyer admitting she "gave this handwritten list to Prime the day [she] resigned")). And it appears they knew what they were doing was, at a minimum, suspect because they did it in a way "so as not to raise any hints internally" at Edelman. (Plfs.' Ex. 39). Then they resigned over a long holiday weekend specifically because it would give them more time to solicit their former clients, which is exactly what they did. (D.I. 129 at 123:22–124:6 (Salyer agreeing that "resigning on a Friday" gave her "more time to reach out to Edelman's clients before they realized [she] had resigned"); Plfs.' Ex. 173 at PCIA-Delaware001264 (Salyer saying "I am working through the weekend to connect with all my clients."); Plfs.' Ex. 85 at PCIA-Delaware002780 (Greenspon contacting her former clients over the holiday weekend)).

Based on the current record, finding that the equities tip toward Prime would only embolden it to induce more of Edelman's planners to breach their covenants with Edelman. That concern is not theoretical. Greenspon's texts revealed that "Prime has brought over a lot" of Edelman's planners. (Plfs.' Ex. 167 at PCIA-Delaware007502). And since the Court issued its initial TRO, it appears that another Edelman planner has joined Prime despite having restrictive covenants with Edelman. (D.I. 99, 101, 106). Just like Greenspon and Salyer, that financial planner resigned on a Friday, which meant that Prime had at least 48 hours to execute its scheme before the Court could intervene. (D.I. 106).

On the other side of the coin is Edelman. Edelman provided Greenspon and Salyer a platform that allowed them to focus on developing client relationships and expanding their books. (D.I. 129 at 12:6–22, 16:1–15, 133:10–12 (Salyer agreeing that "[u]nlike most financial firms, Edelman provides planners with financial leads")). Greenspon benefited from that platform:

30

$50 million of her assets under management that she took to Prime "originated from client leads that were generated and provided to [Greenspon] by Edelman," and "the remaining 250 million in [assets under management] that has transferred from Edelman to Prime with [Greenspon]" came from "referrals from those client leads." (*Id.* at 80:17–20, 81:1–21). Salyer benefited too. She "received a fair amount of [her] clients at Edelman through [Edelman's] engagement center" and "through departed and retiring Edelman planners." (*Id.* at 133:13–18). Put differently, Edelman held up its end of the bargain with Greenspon and Salyer. Equity requires that Greenspon and Salyer do the same.

The Court is aware that at least some of the undertakings in the agreements at issue could ultimately fail when analyzed with the benefit of a more complete record. That, however, does tip the equities. If any party experiences any hardship from a preliminary injunction, that hardship is significantly diminished by the fact that the Court has set trial for August 3, 2026 (D.I. 106 at 5–6), which is less than three months away and well within the ninety-day non-compete period that Prime imposes on its own financial planners. (D.I. 129 at 155:24–156:17).

Ultimately, this factor favors entering a preliminary injunction.

### D.    Public Interest

The public interest also favors entering a preliminary injunction. To start with, Greenspon and Salyer "voluntarily entered into a restrictive covenant agreement with Edelman," and "[p]arties who freely enter into binding agreements should expect to comply with the terms of those agreements." (D.I. 129 at 74:7–9, 118:2–5); *Sensus USA*, 2016 WL 1466488, at *8. By the same token, public interest supports ensuring that companies do not induce their competitors' employees to breach their employment agreements. Moreover, issuing a preliminary injunction here will preserve the status quo pending a final decision on the enforceability of the agreements here, which also preserves the public interest. *Del. State Sportsmen's Ass'n*, 108 F.4th at 200

31

("The 'purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" (quoting *Starbucks Corp.*, 602 U.S. at 346)).

Again, the Court is cognizant of the impact that enforcing a non-acceptance provision could have on Greenspon and Salyer. (D.I. 60 at 11–12). But having gained the benefit of their bargain with Edelman, it is not in the public interest to permit Greenspon and Salyer to skirt the commitments they freely and "voluntarily" made, at least on this preliminary basis, until the Court can hold a trial on the merits of Edelman's claims.[12] (D.I. 129 at 74:7–9, 118:2–5). Moreover, again, any potential harm to Greenspon and Salyer is minimized by the fact that the Court has set trial for August 3, 2026, which is less than three months away. (D.I. 106).

Similarly, the Court is cognizant of the effect that enforcing the non-acceptance provisions can have on Greenspon and Salyer's former clients. But again any negative effect from that has also been minimized (if not eliminated) by the fact that Greenspon and Salyer have already accepted many of their former clients and have been doing so for at least the last three months. The Court expects that customers who want to work with Greenspon and Salyer have already transitioned to Prime, and Edelman has represented that it is not seeking to unwind those relationships. (D.I. 129 at 160:6–20). And again, any preliminary injunction here is temporally tailored to be as short as reasonably possible because trial is now less than three months away. (D.I. 106 at 5–6).

## IV.    CONCLUSION

For the reasons above, Edelman's request for a preliminary injunction is GRANTED.

---

[12]    It is also worth reiterating that Greenspon and Salyer recently entered into similar agreements with Prime, which contain a ninety-day restricted period. (Plfs.' Ex. 7 § 7; Plfs.' Ex. 107 § 7). In doing so, they reaffirmed that at least a ninety-day restricted period is reasonable to protect their employer's legitimate business interests. Trial is now less than ninety days away.

32