IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDELMAN FINANCIAL ENGINES LLC, and EDELMAN FINANCIAL ENGINES, L.P., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 25-1412 (MN) |
| PRIME CAPITAL INVESTMENT ADVISORS, LLC, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Timothy Ryan Dudderar, Tyler E. Cragg, POTTER ANDERSON & CORROON, LLP, Wilmington, DE; Akiva Shapiro, Grace E. Hart, Harris Mufson, GIBSON, DUNN & CRUTCHER LLP, New York, NY – Attorneys for Plaintiffs Edelman Financial Engines LLC and Edelman Financial Engines, L.P.

Brian Egan, Cameron P. Clark, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Douglas M. Weems, Michael W. Seitz, SPENCER FANE LLP, Kansas City, MO – Attorneys for Defendant Prime Capital Investment Advisors, LLC

July 8, 2026
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**

Prime is inducing Edelman's former financial advisors to breach their restrictive covenants with Edelman. At least that's what Edelman says. After briefing, a preliminary injunction hearing, and argument from both sides, the Court will preliminarily enjoin Prime (in part). This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.    BACKGROUND

### A.    The Parties

Plaintiffs Edelman Financial Engines LLC and Edelman Financial Engines, L.P. (collectively, "Edelman") compete with defendant Prime Capital Investment Advisors ("Prime") in the financial planning space. Edelman Financial Engines LLC is a Delaware LLC with its principal place of business in Massachusetts. (D.I. 175 ℙ 15). It is wholly owned by Edelman Financial Engines, L.P., which is a Delaware limited partnership. (*Id.*). Prime is a Kansas LLC with its principal place of business in Kansas. (D.I. 15 at 2).

### B.    History of this Litigation

Edelman and Prime have been locked in this dispute since last November. (D.I. 1). Edelman accused Prime and its senior executives of poaching Edelman's financial planners and inducing those financial planners to breach their contractual obligations to Edelman (among other things). (*See generally*, *id.* ℙℙ 6–12, 57–81; D.I. 175 ℙℙ 6–14, 69–89). Edelman previously moved for a TRO and preliminary injunction with respect to Prime's recruitment of two of Edelman's financial planners (Ms. Greenspon and Ms. Salyer). (D.I. 32). On March 12, 2026, the Court granted that TRO in part, and after a preliminary injunction hearing, issued a preliminary injunction. (D.I. 60, 138).

On May 9, 2026, Edelman moved for another TRO and preliminary injunction, this time predicated on Prime Capital's hiring of Brendan Kenny, a different one of Edelman's former financial planners. (D.I. 99, 101). The Court granted that TRO to preserve the status quo, and ordered the parties to proceed on an expedited basis before holding a preliminary injunction hearing on May 22, 2026. (D.I. 106; D.I. 149). After hearing evidence and argument at the preliminary injunction hearing, the Court dissolved the TRO and ordered the parties to provide Kenny's former Edelman clients with joint notice of his departure. (D.I. 149 at 130:8–131:18). The Court also ordered that Kenny refrain from direct or indirect solicitation of his former Edelman clients but stated that it would not preclude Kenny from accepting his former Edelman clients "if they reach out to [Kenny] as opposed to [Kenny] reach[ing] out to them." (*Id.*). The Court also told Kenny that in his discussions with former clients, he "need[s] to be very careful that [he is] not soliciting them for business." (*Id.*).

### C.    Evidence Presented at the Preliminary Injunction Hearing

#### 1.    Brian Lipps

Brian Lipps is Edelman's Regional Director who supervised Kenny during his employment at Edelman. (D.I. 149 at 3:19–4:2). Lipps testified that Kenny serviced 411 client households and had approximately $319.6 million in assets under management while at Edelman. (*Id.* at 4:15–23). Lipps also testified about the support Edelman provided Kenny to allow him to grow his book. For example, Edelman "gave [Kenny] leads for prospective clients" in addition to providing Kenny actual clients. (*Id.* at 5:8–6:12). Edelman also provided Kenny "back office support," "a dedicated client service associate," "[a]nd [] made sure that [Kenny] had the tools that he needed whether they be investment management solutions or financial planning tools." (*Id.*).

Lipps testified that Kenny had access to confidential information about the clients he served, including "name and address contact information" and "each client's financial

2

information." (*Id.* at 6:16–23).  Lipps also testified that Edelman has an obligation to protect its clients' information and that the information it has about its clients is "extremely valuable" because it reflects "the fact that they have a propensity to work with an adviser [] and [that] they're willing to pay a fee for it." (*Id.* at 7:2–19).

Lipps stated that approximately twenty of Kenny's Edelman clients cancelled their account with Edelman after Kenny resigned, which caused Edelman to lose not only those current assets under management but also "future opportunity associated with those clients." (D.I. 149 at 9:3–10:3).  He also stated that when financial planners like Kenny leave, it is "extremely disruptive and chaotic," and causes "irreparable reputational harm." (*Id.* at 9:10–10:25).

### 2.    **Brendan Kenny**

Brendan Kenny was a financial planner at Edelman before deciding to move to Prime on May 8, 2026, where he now works. (D.I. 149 at 13:6–12, 23:5–6).  While at Edelman, Kenny voluntarily signed two restrictive covenants, one in 2019 and one in 2024. (D.I. 149 at 49:24–50:11, 50:21–51:10; Plfs.' Exs. 4, 6 (collectively, "RC Agreements")).  He also signed a Proprietary Information, Non-Solicitation, Non-Disparagement and Arbitration Agreement. (Plfs.' Ex. 2 ("PINNA Agreement")).  These agreements contain provisions that prevent Kenny from disclosing Edelman's confidential information to third parties. (Plfs.' Ex. 2 § 1; Plfs.' Ex. 4 § 1; Plfs.' Ex. 6 § 2).  Under these agreements, Kenny agreed not to solicit or accept business from any of his Edelman clients for fifteen months after departing Edelman. (Plfs.' Ex. 2 § 4; Plfs.' Ex. 4 § 4; Plfs.' Ex. 6 § 5).  Delaware law governs the PINNA Agreement, and Connecticut law governs the RC Agreements. (Plfs.' Ex. 2 § 11(c); Plfs.' Ex. 4 § 11(c); Plfs.' Ex. 6 § 12(d)).

Around May 2025, Kenny began exploring options to leave Edelman. (*Id.* at 13:13–16).  Also around that time, Kenny began using publicly available sources, such as the white pages, to compile contact information for the clients he serviced at Edelman, and he cross referenced his

Edelman client list to confirm the public information he found. (*Id.* at 13:17–14:15, 71:6–11). He recorded this information on a Chromebook and created a handwritten backup. (*Id.* at 13:17–14:15, 21:21–22:9). Kenny testified that none of this information included any financial information associated with the names on the list. (*Id.* at 22:7–9). This process began before Kenny ever contacted Prime about a potential move, and nobody (including Prime) instructed Kenny to perform this exercise. (*Id.* at 14:16–20). The first time Kenny had any contact with Prime was September 2025, and he only met Prime once before joining in May 2026. (*Id.* at 14:21–15:9). In the interim, Kenny explored moving to other firms. (*Id.* at 15:10–13). He initially agreed to join a different firm (Stratos), but that fell through at the eleventh hour. (*Id.* at 16:7–23).

Kenny testified that around March 2026 Edelman asked him to sign a new restrictive covenant at which time he sought independent counsel and learned for the first time that Edelman's "language was a lot more restrictive within the industry than [he] thought." (*Id.* at 15:14–16:4). Nonetheless, Edelman was "a hard no on making any changes" in the proposed restrictive covenant. (*Id.* at 19:1–17; Defs.' Ex. 6). Kenny did not initially sign that restrictive covenant, and because of that, he effectively lost $600,000 to $1,000,000 worth of shares at Edelman. (*Id.* at 17:15–18:1). He was also marked with a "red flag" internally at Edelman because he did not sign a new restrictive covenant. (*Id.*).

After finding this out, Kenny reached back out to Prime and sent them copies of his restrictive covenants. (*Id.* at 20:16–21, 52:12–20). By this time, Kenny had deleted the white pages research from his Chromebook, although he still had his handwritten backup. (*Id.* at 21:21–22:8). When Kenny resigned from Edelman, he did so by emailing Brian Lipps, and he consulted with Spencer Fane (the law firm representing Prime) on the content of that email. (*Id.* at 23:7–10,

4

61:11–14).  At that time, and using his personal email,[1] Kenny also began sending some of his Edelman clients a notification that he was moving firms.  That notification read:

> Good morning, I wanted to inform you that I have resigned from Edelman Financial Engines and will be registering with a new financial advisory firm later today, Friday May 8th, 2026.

(Defs.' Ex. 21).  The email concluded by providing Kenny's contact information at Prime, although Kenny stated that his new job title caused some confusion, which he clarified in subsequent communications.  (D.I. 149 at 24:24–25:6).

At the hearing, Kenny characterized his email as a "fiduciary announcement," but agreed that he was "never going to send any purported fiduciary notice if [he] went to Stratos."  (*Id.* at 23:25–24:2, 69:3–5).  Kenny also acknowledged that he never sent a fiduciary notice when he joined Edelman from Fidelity.  (*Id.* at 69:6–8).  Additionally, one of Prime's other employees, Stu Berrin, told Kenny: "Don't call the ones u don't want" and that the "[b]est part" about moving to Prime "is shedding the a holes," about which Kenny "[a]greed!"  (Plfs.' Ex. 15 at PCIA-Delaware011634).  Somewhat contradictory to the above, Kenny testified that he sent the notice email out of concern that Edelman would not tell his clients where he went because Edelman had advised its employees "to never [tell the clients] where the departed advisor had gone under any circumstances."  (D.I. 149 at 23:11–19).

Kenny testified that he sent his email to 280 of his 411 former Edelman clients, although, "under the advice of counsel," he did not contact his two Delaware clients.  (*Id.* at 28:3–6, 29:25–30:5, 70:2–5).  Some clients responded to Kenny's email wishing him "all the best in [his] future

---

[1]    Kenny stated that it was his idea to use his personal email address to reach out to his former Edelman clients. (D.I. 149 at 63:4–21).  Additionally, Kenny testified that his wife assisted with this outreach, and that Prime was aware that Kenny's wife would assist. (*Id.* at 61:25–62:2, 64:7–18).

endeavors" and wishing him "[g]ood luck." (Plfs.' Exs. 35, 41). Kenny responded to those emails by asking for the best number to call, something one of Prime's other employees (Stu Berrin) encouraged him to do. (Plfs.' Exs. 35, 41). In fact, Stu Berrin, encouraged Kenny to "dial like crazy" and "get calls in as quickly as possible." (Plfs.' Ex. 15 at PCIA-Delaware011633, PCIA-Delaware011637). That outreach occurred the weekend Kenny joined Prime, and Kenny testified that he would have contacted all his clients "including [his] Delaware clients" had the Court not issued a temporary restraining order. (*Id.* at 29:7–14).

During that outreach, Kenny testified that he offered some of his clients discounts if they joined Prime in response to learning that Edelman had offered those same clients discounts if they stayed at Edelman. (*Id.* at 43:14–24, 44:15–45:8). In other cases, Kenny testified that he coordinated with Prime's staff to send brochures to Edelman's clients. (*Id.* at 75:13–19; *see* Plfs.' Ex. 46). Generally speaking though, Kenny stated that when he spoke with his former Edelman clients, his usual script was to inform the client of his non-solicit and inform the client that they could ask him questions, which he would then answer. (D.I. 149 at 72:20–73:1).

Kenny testified that he kept notes of his conversations with his clients in a spreadsheet, and he updated it after the Court entered a temporary restraining order. (*Id.* at 30:24–31:6). He testified that he no longer has access to that document and that it has been turned over to his attorneys. (*Id.* at 31:7–10). He also testified that he had contact with some of his former clients after the Court issued the temporary restraining order, and that those communications were limited to telling his former clients about the temporary restraining order and that he was "restrict[ed] from discussing much further." (*Id.* at 31:23–32:1).

### 3.    Glenn Spencer

The final person to testify was Glenn Spencer, Prime's CEO. Spencer testified that Prime did not engage in a drawn-out recruitment of Kenny. (*Id.* at 81:4–18). Instead, contact with Kenny

6

was sporadic, and between December and May, Kenny "fell off the radar." (*Id.*). That said, Spencer testified that Prime was aware of Kenny's restrictive covenants and that Prime discussed internally how Kenny would resign and notify his Edelman clients once he joined Prime. (*Id.* at 89:6–24). Spencer testified that he was aware of the Court's prior temporary restraining order and that he instructed his team to do everything in accordance with this Court's instructions.[2] (*Id.* at 82:2–16). In particular, Prime gave Kenny specific instructions to construct a client list using "publicly available sources" and that Prime told Kenny "[d]on't take the list from any Edelman systems or anything." (*Id.* at 82:17–25). He also stated that Prime modified the notice email to clients based on this Court's prior ruling, so that it did not include the portions the Court found could be solicitation. (*Id.* at 82:17–84:2, 88:11–17).

Spencer stated that he became aware of this Court's temporary restraining order based on Kenny's conduct late in the afternoon on May 11, the day this Court issued that order. (*Id.* at 85:19–22). Spencer also testified that Prime has abided by that TRO.[3] (*Id.* at 85:23–86:8).

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must show (1) a likelihood of success on the merits; (2) irreparable harm absent preliminary relief; (3) that the balance of the equities is in its favor; and (4) that the public interest is supported by the relief. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024); *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). Although the party

---

[2]    The Court found Spencer's testimony generally credible overall but particularly so on this point.

[3]    The lone exception was that Prime accepted business from Kenny's family members, which Edelman agreed to allow. (D.I. 149 at 86:2–4).

seeking a preliminary injunction must prove its case by "a clear showing" (*Del. State Sportsmen's Ass'n*, 108 F.4th at 202 (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam))), it must prove the second factor (irreparable harm) by a preponderance of the evidence. *Reilly*, 858 F.3d at 179. As the Third Circuit (and Supreme Court) recently reiterated, "[t]he 'purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Del. State Sportsmen's Ass'n*, 108 F.4th at 200 (quoting *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024)).

## III.    DISCUSSION

### A.    Prime's Procedural Arguments

Before addressing the merits of Edelman's claims, the Court addresses Prime's procedural arguments. ***First***, Prime says that Edelman's preliminary injunction request with respect to Kenny improperly expands the scope of the complaint. (D.I. 112 at 4). The Court disagrees. The operative complaint alleges that Prime engaged in a scheme to hire away Edelman's financial planners and convince those departing planners to breach their restrictive covenants with Edelman. (D.I. 175 ¶¶ 1, 6–14). The allegations as to Kenny fit within the scheme in the operative complaint. Regardless, Plaintiffs amended their complaint to include allegations to Kenny, so this argument is moot. (D.I. 175 ¶¶ 69–89; *see also id.* ¶¶ 122–145 (specific allegations related to Kenny)). ***Second***, Prime says that the Court does not have personal jurisdiction over Prime for the allegations that relate to Kenny. (D.I. 112 at 4–5). That argument reads Edelman's claims too narrowly. Edelman has claimed that Prime engaged in a playbook to poach Edelman's planners and induce those planners to breach their restrictive covenants with Edelman. As part of that scheme, Edelman alleges that Prime has induced Edelman's departing planners to solicit and steal Edelman's clients that reside in Delaware. (D.I. 175 ¶¶ 22–23, 112, 125). That sufficiently pleads the requisite minimum contacts for personal jurisdiction. (*See* D.I. 60 at 6–7). Regardless, Kenny himself

8

confirmed that, had the Court not timely issued a TRO, Kenny would have expressly aimed his conduct (which Edelman alleges was coordinated by Prime) at Delaware by reaching out to his Delaware-based clients. (D.I. 149 at 29:7–14). ***Third***, Prime says this Court should defer to state proceedings that Kenny filed in May 2026, months after Edelman filed its complaint here. (D.I. 112 at 6). But once Kenny departed, Edelman promptly moved for a TRO and preliminary injunction with respect to Kenny, and the Court does not believe this is one of the "extremely limited circumstances" in which a federal court should disregard its "virtually unflagging obligation . . . to exercise the jurisdiction given" by Congress and defer to pending state court proceedings. *Ryan v. Johnson,* 115 F.3d 193, 195–96 (3d Cir. 1997). Moreover, to the extent Prime is concerned about "piecemeal litigation" (D.I. 112 at 6), that concern is best addressed by hearing the entirety of the dispute between Edelman and Prime in one lawsuit (*i.e.*, this lawsuit); not deferring to disparate state proceedings.

### B.      Preliminary Injunction Analysis

Now to the merits. As previously discussed, the Court must analyze four factors for Edelman's preliminary injunction request: likelihood of success on the merits, irreparable harm, balancing of the equities, and the public interest. *Del. State Sportsmen's Ass'n*, 108 F.4th at 202.

### 1.      Likelihood of Success

To demonstrate likelihood of success on the merits, Plaintiffs need only show that their argument has a "reasonable probability of success – odds that are significantly better than negligible but not necessarily more likely than not." *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 218 (3d Cir. 2025) (citing *Reilly v. City of Harrisburg,* 858 F.3d 173, 176, 179 (3d Cir. 2017)) (internal quotations omitted).

### a.    Tortious Interference with Contract[4]

For the tortious interference with contract claim, Edelman must show it has a reasonable probability of success showing "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013); *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1266 (Del. 2004). The Court will address each factor in turn. On the first factor, Prime does not meaningfully contest that Kenny had agreements with Edelman and that those contracts are valid from the offer, acceptance, and consideration standpoint, so the Court focuses on whether these agreements are valid and enforceable restrictive covenants.

### i.    The Confidentiality and Non-solicitation

The confidentiality and non-solicitation provisions in Kenny's PINNA Agreement are governed by Delaware law. (Plfs.' Ex. 2 § 11(c)). Through those provisions, Kenny agreed to not misuse or disclose Edelman's confidential information, and he also agreed not to solicit Edelman's clients. (Plfs.' Ex. 2 §§ 1, 4). This Court previously analyzed whether confidentiality and non-solicitation provisions are valid and enforceable under Delaware law, finding it reasonably likely that sub-two-year confidentiality and non-solicitation provisions are valid and enforceable. (D.I. 60 at 11; D.I. 138 at 16–17). That same analysis applies to the PINNA agreement here.

Now to the confidentiality and non-solicitation provisions in Kenny's RC Agreements, which are governed by Connecticut law. (Plfs.' Ex. 4 § 11(c); Plfs.' Ex. 6 § 12(d)). In those

---

[4]    Edelman also moved for a preliminary injunction based on its tortious interference with business relations and unfair competition claims. (*See* D.I. 101 at 14–16). But, even assuming a reasonable probability of success on those claims, the Court need not address those arguments because any relief the Court would grant there is less than or the same as what the Court is granting here.

provisions, Kenny agreed to not misuse or disclose Edelman's confidential information, and he also agreed not to solicit Edelman's clients. (Plfs.' Ex. 4 §§ 1, 4; Plfs.' Ex. 6 §§ 1, 5). Connecticut law is similar to Delaware law; that is, Connecticut law enforces restrictive covenants that are reasonable. *SS & C Techs., Inc. v. Maher*, Case No. HHDCV156061190S, 2015 WL 7270331, at *1 (Conn. Super. Ct. Oct. 20, 2015) ("Connecticut courts will enforce only reasonable covenants not to compete.").

Five factors guide this analysis: "(1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests." *Robert S. Weiss & Associates, Inc. v. Wiederlight*, 208 Conn. 525, 546, n.2 (1988). As to the first factor, courts applying Connecticut law have upheld restrictions that last longer than Kenny's fifteen-month limitation. *Robert S. Weiss & Associates, Inc.*, 208 Conn. at 531 (upholding two-year limitation); *see also A.H. Harris & Sons, Inc. v. Naso*, 94 F. Supp. 3d 280, 294 (D. Conn. 2015) ("Connecticut courts have upheld restrictive covenants [] lasting two years or more on multiple occasions."). As to the second factor, geographical area, Edelman is seeking to enforce the RC Agreements only as to those clients "with whom Brendan Kenny worked while he was employed by Edelman." (D.I. 99 at § II(b)). So even though the RC Agreements have no express geographic limitation, they are reasonably tailored in scope (at least under the standard governing preliminary injunctions). *See A.H. Harris & Sons, Inc.*, 94 F. Supp. 3d at 293 (stating that restrictive covenant "can be reasonable even if it fails to specify a geographic area"). The third factor is effectively the same as Delaware's requirement that the restrictive covenant protect a legitimate business interest. *See id.* at 297. For substantially the same reasons as the PINNA Agreement above, the RC Agreements fairly protect Edelman's interests. The

11

fourth factor looks to "whether or not the Agreement as drafted and applied would unfairly restrain [Kenny's] 'opportunity' to pursue [his] occupation." *Creative Dimensions, Inc. v. Laberge*, No. CV116020991, 2012 WL 2548717, at *5 (Conn. Super. Ct. May 31, 2012). Nothing in the non-solicitation agreement prevents Kenny from working elsewhere as a financial advisor or otherwise providing his services to clients, so it is reasonably likely that this factor is satisfied.[5] The fifth factor balances the public interest, and because the public interest is served by enforcing contracts that parties willingly enter, this factor is satisfied. With that, the Court finds it is reasonably likely that the confidentiality and non-solicitation provisions in Kenny's RC Agreements are valid and enforceable.

ii.       The Non-Acceptance Provisions

Next, the non-acceptance provisions in Kenny's PINNA and RC Agreements. The non-acceptance provisions prohibit Kenny from accepting any business from his former Edelman clients for fifteen months after leaving Edelman. (Plfs.' Ex. 2 § 4; Plfs.' Ex. 4 § 4; Plfs.' Ex. 6 § 5). That means that if one of his clients learned of his departure, Kenny would have to refuse servicing the client's accounts, even if that client insisted that Kenny was the one and only financial planner trusted. That matters because Delaware and Connecticut law require evaluating the harm

---

[5] It is relevant to the Court's analysis that Edelman is seeking to enforce the non-solicit only as to those clients "with whom Brendan Kenny worked while he was employed by Edelman." (D.I. 99 at § II(b)); *see Creative Dimensions, Inc.*, 2012 WL 2548717, at *5 (stating that "[a] blanket prohibition on working with or soliciting current or prospective [] customers" would be "impractical and impossible" to enforce). This is also why Prime's argument that these agreements are unreasonable because "they apply to both current and potential clients, and do not identify the specific clients and potential clients Mr. Kenny is precluded from soliciting" makes little sense under the facts of this case. (D.I. 112 at 15). In addition, Prime's argument that these agreements are unreasonable because "the restrictions apply with equal force to clients whom Mr. Kenny brought with him to EFE as it does to clients whom he was introduced to by EFE" is untethered from the facts of this case because Kenny said he did not bring any clients to Edelman when he joined in 2013. (D.I. 112 at 15; D.I. 149 at 67:8–15).

to the public before enforcing provisions in a restrictive covenant. (Plfs.' Ex. 2 § 4; Plfs.' Ex. 4 § 4; Plfs.' Ex. 6 § 5). Here, enforcing the non-acceptance provision would unduly harm the public by depriving Kenny's former clients of access to the financial planner of their choice. That seems to go beyond what is necessary to protect Edelman's legitimate business interests, so, at least at this stage, Edelman has not shown a reasonable likelihood of success that the non-acceptance provisions in Kenny's contracts are valid and enforceable.

To be sure, the Court came to a different conclusion when evaluating the non-acceptance provisions as to Greenspon and Salyer. (D.I. 138 at 32). But the harm to the public was distinctly different there. In that case, Greenspon and Salyer had been soliciting and accepting their former clients for months before the Court could intervene, and Edelman did not seek to unwind any of that. (*Id.*). Given those facts, the Court found the harm to the public in enforcing the non-acceptance provisions minimal specifically because it "expects that customers who want to work with Greenspon and Salyer have already transitioned to Prime." (*Id.*). Here, the harm to the public is different because, given this Court's quick TRO, clients who truly wish to have Kenny as their financial advisor may not have had the opportunity to continue with him as their advisor.

With that, the Court finds that, at least at this stage, it is not reasonably likely that the non-acceptance provisions in Kenny's PINNA and RC Agreements are valid and enforceable.

### iii.    Prime's Knowledge of Kenny's Agreements

There is no dispute that this factor is satisfied, which makes sense because the evidence at the preliminary injunction hearing showed that Prime was aware of the relevant contracts before Kenny joined Prime. (D.I. 149 at 89:15–24).

### iv.    Intentional Act Causing a Breach

This factor asks whether the defendant "intentionally acted in a way that significantly contributed to" an employee breaching their restrictive covenant with a former employer. *Great*

13

*Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC,* No. 3718 (VCP), 2010 WL 338219, at *13 (Del. Ch. Jan. 29, 2010).

The first step here is determining whether it is reasonably likely that Kenny breached his restrictive covenants. There was scant evidence presented at the preliminary injunction hearing that to the extent (if at all) Kenny used or otherwise disclosed any of Edelman's confidential information, Prime had any role in that. Thus, based on the current record, Edelman has not shown a reasonable likelihood of success there.

The non-solicitation provisions are different. At the preliminary injunction hearing, Kenny admitted to sending his clients an email that informed them of his resignation from Edelman. (*See* Plfs.' Ex. 21). Although that email, standing alone, may not constitute solicitation in the traditional sense of persuading his clients to switch financial services firms, it is reasonably likely that Kenny's later offers to provide clients a discount "to leave Edelman for Prime" would constitute solicitation. (D.I. 149 at 43:14–24, 44:15–45:8); Plfs.' Ex. 2 § 4(b)(2) (prohibiting Kenny from "persuad[ing] or induc[ing]" clients "to terminate, reduce or not renew its relationship with" Edelman); Plfs.' Ex. 4 § 4(b)(1) (similar); Plfs.' Ex. 6 § 5(b)(1) (similar)). In addition, Kenny coordinated with Prime's staff to send brochures to Kenny's former Edelman clients, presumably to convince them to switch their accounts to Prime. (D.I. 149 at 75:13–19; *see also* Plfs.' Ex. 46).

The next question is whether Prime "intentionally acted in a way that significantly contributed to" that breach. *Great Am. Opportunities, Inc.,* No. 3718 (VCP), 2010 WL 338219, at *13. It is reasonably likely at this stage that Prime did. To start, one of Prime's other employees encouraged Kenny to "dial like crazy" and call his former clients "as quickly as possible," likely to convince them to switch their accounts to Prime. (Plfs.' Ex. 15 at PCIA-Delaware011633, PCIA-Delaware011637). Additionally, when Kenny offered his former Edelman clients discounts

14

to join Prime, he was already employed at Prime. (D.I. 149 at 43:14–24, 44:15–45:8). Moreover, Prime knew about Kenny's restrictive covenants but still coordinated with Kenny to provide his clients marketing material to come to Prime. (*Id.* at 52:12–20, 89:6–24). Given that, it is reasonably likely that Prime acted in an intentional way that significantly contributed to Kenny's breach of the non-solicitation provision.

### v.    Justification

Prime does not mount any meaningful justification for its conduct here. To be sure, Prime says that Kenny was required to send the initial email to clients as a "fiduciary notice," (D.I. 112 at 9–12), but even assuming Kenny was required to provide a fiduciary notice,[6] Prime has pointed to nothing to justify assisting Kenny's actions that go beyond providing notice, *i.e.*, offering discounts for clients to switch to Prime and providing brochures to solicit clients to Prime. With that, it is reasonably likely that Prime was not justified.

---

[6]    Prime has raised this fiduciary-duty notice argument several times now, and the Court remains skeptical. Initially, Prime "cited no authority stating that [financial planners] were under fiduciary duties to inform their clients about a change of employment." (D.I. 60 at 13). Then, Prime argued that the CFP Board's Code of Ethics and Standards of Conduct required providing such a notice, but the provisions it pointed to did not expressly "say anything about notifying clients of a change in employment." (D.I. 138 at 23). Now, the evidence at Kenny's preliminary injunction hearing seemed to indicate that even financial planners themselves do not believe such a duty exists. After all, Kenny himself was never planning on sending one when he planned to join Stratos, and he did not send a fiduciary notice when he joined Edelman. (D.I. 149 at 69:3–5, 69:6–8). Additionally, one of Prime's employees, Stu Berrin, told Kenny that the best part of moving to Prime was "shedding the a holes," and encouraged Kenny not to call the clients he did not want. (Plfs.' Ex. 15 at PCIA-Delaware011634). Finally, if such a duty actually existed, the Court does not believe Prime's counsel would have advised Kenny to breach that duty by directing him to ***not*** provide notice to some of his clients (*i.e.*, those in Delaware). (D.I. 149 at 28:3–6, 29:25–30:5, 70:2–5).

15

vi.    Harm

The final factor is whether Edelman was harmed.  There seems to be little debate that this factor is satisfied, so the Court will not belabor the point.  At the time of the hearing, Edelman had lost approximately twenty of Kenny's clients to Prime.  (D.I. 149 at 32:21–23).  Moreover, Edelman provided testimony that when financial planners abruptly leave it is "extremely disruptive and chaotic," which causes harm in the form of loss of goodwill and reputational damage.  (*Id.* at 9:10–10:25).  It is reasonably likely that Edelman has suffered harm.

## 2.    **Irreparable Harm**

Edelman has shown it is more likely than not that it will suffer irreparable harm absent preliminary injunctive relief.  *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).  Based on the evidence the Court has seen to date, Edelman has shown that it is reasonably likely that Prime tortiously interfered with Kenny's restrictive covenants, in particular the non-solicit he agreed to.  The point of a non-solicitation agreement is to prevent departing employees from exploiting the goodwill of a client or customer, which had been cultivated and maintained at an employer's expense, to that employer's detriment.  That concern is particularly salient here given Edelman's unrebutted testimony that it "gave [Kenny] leads for prospective clients," "reassign[ed]" clients to Kenny from departing and retiring planners, and provided Kenny "back office support" and "a dedicated client service associate," which allowed Kenny to focus on cultivating client relationships.  (D.I. 149 at 5:8–6:12).  There is evidence that Kenny's departure "was disruptive to Edelman's client relationships and goodwill," and that abruptly leaving "chips away at the trust and all the goodwill" Edelman built up with its clients.  (D.I. 149 at 10:4–25; Plfs.' Ex. 45 (client expressing confusion about "what happens with [their] accounts at [Edelman] and who is taking over")).  Calculating harm to client relationships and goodwill is irreparable

16

because it is exceedingly difficult to quantify. Absent a preliminary injunction, it is more likely than not that this harm will continue.

There are also other reasons why it is more likely than not that Edelman has suffered, and will continue to suffer, irreparable harm absent a preliminary injunction. As an initial matter, under Delaware law, by inducing Kenny to breach his restrictive covenants with Edelman, Prime caused Edelman irreparable harm, and continued breach would cause further irreparable harm. *Cleveland Integrity Servs., LLC v. Byers*, Case No. 24-371 (MTZ), 2025 WL 658369, at *17 (Del. Ch. Feb. 28, 2025) ("[A] breached restrictive covenant causes irreparable harm."); *VisonPoint, LLC v. Gish*, No. HHDCV166068213S, 2016 WL 8135540, at *6 (Conn. Super. Ct. Dec. 27, 2016) ("Restrictive covenants are recognized as valuable business assets that are entitled to protection . . . . Loss of the benefits of compliance with such agreements is recognized as an irreparable injury . . . ; since a party's actual injury is not, because of its nature, susceptible to determination."). Additionally, when he signed the PINNA and RC Agreements here, Kenny agreed that breach would cause immediate and irreparable harm. (Plfs.' Ex. 2 § 10(a); Plfs.' Ex. 4 § 10(a); Plfs.' Ex. 6 § 11(a)); *see TP Grp.–CI, Inc. v. Vetecnik,* No. 16-623 (RGA), 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016) ("Under Delaware law, 'contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing preliminary injunctive relief.'"). And finally, Edelman provided unrebutted testimony that when it loses a client, it also loses "future opportunity associated with those clients." (D.I. 149 at 9:3–10:3). As this Court previously stated, that type of harm "is exceedingly difficult, if not impossible to quantify." (D.I. 60 at 14–15).

Prime's main argument against irreparable harm is that money damages are adequate, pointing to an expert report Edelman provided in a different case. (D.I. 112 at 7–8). But as the

17

Court already opined, "[t]he issue with that argument is that the expert report in question was limited to calculating the 'economic losses[.]' [W]hat that report does not address is the likely non-economic harm to Edelman's goodwill, existing client relationships or future referrals." (D.I. 138 at 29).

Taken as a whole, the evidence here shows that the irreparable harm prong is satisfied as to the non-solicitation agreement.

### 3.    Balancing the Equities and Public Interest

The equities favor enforcement. Just as with the prior financial planners, nothing prohibits Kenny "from working at Prime in a manner consistent with the contractual obligations to which [he] agreed." (D.I. 60 at 15). On the flip side, absent preliminary relief, Edelman faces continued loss of clients and future opportunities with those clients if Kenny is permitted to solicit his former clients away. Certainly there is some harm here to Prime, but that harm is mitigated by the fact that Prime may still onboard Kenny's former Edelman clients; Prime simply cannot induce Kenny to breach his covenants with his prior employer. The public interest is served by enforcement because "[p]arties who freely enter into binding agreements should expect to comply with the terms of those agreements." *Sensus USA, Inc. v. Franklin*, Case No. 15-742 (RGA), 2016 WL 1466488, at *8 (D. Del. Apr. 14, 2016). Thus, the equities and public interest favor enforcement of the non-solicitation provision.

## IV.    BOND

Prime also asks this Court to enter a bond under Rule 65(c). Rule 65(c) of the Federal Rules of Civil Procedure states that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Rule 65(c)'s bond requirement protects the defendant "in the event its conduct was

18

wrongfully enjoined." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 391 (3d Cir. 2021). "The amount of security required for an injunction under Rule 65(c) is left to the discretion of the district court." *Scanvec Amiable Ltd. v. Chang*, 80 F. App'x 171, 177 (3d Cir. 2003). Determining the appropriate bond amount requires "accounting for the factual circumstances of the parties and tying the scope of the injunction to the bond amount it decides to set." *Mallet & Co.*, 16 F.4th at 391. In rare circumstances where "there is no risk of monetary loss to the defendant," a district court may exercise its discretion to not require a bond. *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988).

In this case, it is possible that Prime will suffer at least some economic harm from this Court's injunction. That is because by preventing Prime from inducing Kenny to solicit Kenny's former Edelman clients, it is possible that Prime will not realize profits it otherwise would have. The difficult part here though is adequately accounting for what that potential harm is. The scope of this injunction is narrow. The Court is not preliminarily enjoining Prime from accepting any of Kenny's former clients; Prime simply may not induce Kenny to solicit any of his former clients. And based on the evidence at the preliminary injunction hearing, some of Kenny's former Edelman clients have already joined Prime. Prime says the appropriate bond amount is $3,190,000, calculating that bond amount by taking 10% of the value of the assets Kenny managed while at Edelman. (D.I. 112 at 19). It is not clear to this Court though that the dollar amount of assets in accounts at Edelman is an adequate proxy to calculate the harm that Prime will suffer here, particularly given that there was never any guarantee that any percentage of those clients would have transferred to Prime. Moreover, the cost of complying with this Court's order is negligible; it costs nothing for Prime to simply not induce Kenny to solicit his former clients.

19

Much more tied to the facts of this case than Prime's proposed bond amount would be the amount that Prime paid Kenny to join Prime, $750,000. (D.I. 149 at 76:15–16). That amount represents Prime's investment into Kenny and the financial harm Prime may suffer from potentially being wrongfully enjoined. It may be on the higher side of what is necessary to compensate Prime for the narrow preliminary injunction here, particularly given that Kenny may still work at Prime and that the Court is not enjoining Prime from accepting Kenny's former clients, but "[w]hen setting the amount of security, district courts should err on the high side." *Scanvec Amiable Ltd. v. Chang*, No. CIV.A. 02-6950, 2002 WL 32341772, at *3 (E.D. Pa. Nov. 1, 2002) (quoting *Mead Johnson & Co. v. Abbott Lab.,* 201 F.3d 883, 888 (7th Cir. 2000)), *aff'd*, 80 F. App'x 171 (3d Cir. 2003).

## V.    CONCLUSION

For the foregoing reasons, Edelman's request for a preliminary injunction is GRANTED-IN-PART and DENIED-IN-PART.

20